Garcia v New York City Dept. of Health & Mental Hygiene (2018 NY Slip Op 04778)

Garcia v New York City Dept. of Health & Mental Hygiene

2018 NY Slip Op 04778 [31 NY3d 601]

June 28, 2018

Stein, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, September 16, 2018

[*1]

Magdalena Garcia, Individually and on Behalf of Her Minor Child, P.S., et al., Respondents,
v
New York City Department of Health and Mental Hygiene et al., Appellants.

Argued June 6, 2018; decided June 28, 2018

Garcia v New York City Dept. of Health & Mental Hygiene, 144 AD3d 59, reversed.

{**31 NY3d at 604} OPINION OF THE COURT

Stein, J.

On this appeal, respondents the New York City Department of Health and Mental Hygiene (the Department), the New York City Board of Health (the Board), and Dr. Mary Travis Bassett, as Commissioner of the Department, argue that Supreme Court and the Appellate Division erred by enjoining enforcement of the Board's amendments to the New York City Health Code mandating that children between the ages of 6 months and 59{**31 NY3d at 605} months who attend city-regulated child care or school-based programs receive annual influenza vaccinations. We agree. The Board's promulgation of the flu vaccine rules falls squarely within the powers specifically delegated to the Department in Administrative Code of the City of New York § 17-109, and the Board's actions did not violate the separation of powers doctrine. Further, the flu vaccine rules are not preempted by state law.
I. Background
New York City and New York State share regulatory authority over child care facilities and programs located in the city. Through the New York City Health Code, the Department and Board[FN1] regulate health and safety [*2]standards for school-based programs for children ages three through five years, as well as public and private group day care services for children under the age of six (see NY City Health Code [24 RCNY] arts 43, 47), while the State maintains oversight of smaller family and group family day care programs, as well as school-age child care (see Social Services Law § 390 [1] [c]-[f]; [13]).
As a matter of state law, Public Health Law § 2164 requires every child between the age of two months and 18 years to receive vaccines against certain enumerated diseases—namely, "poliomyelitis, mumps, measles, diphtheria, rubella, varicella, Haemophilus influenzae type b (Hib), pertussis, tetanus, pneumococcal disease, and hepatitis B" (Public Health Law § 2164 [2] [a]). Absent proof of these immunizations, the Public Health Law prohibits officials in charge of "any public, private or parochial child caring center, day nursery, day care agency, nursery school, kindergarten, elementary, intermediate or secondary school" within the state from allowing any unvaccinated child to attend for more than 14 days (id. § 2164 [1] [a]; [7] [a]). However, a statutory exception permits admission of an unvaccinated child if a physician certifies that "immunization may {**31 NY3d at 606}be detrimental to [the] child's health" or if the child's parent or guardian objects based on "genuine and sincere religious beliefs" (id. § 2164 [8], [9]).[FN2]
Prior to the amendments at issue here, New York City Health Code §§ 43.17 and 47.25 required that children attending child care programs under the Department's jurisdiction "be immunized . . . in accordance with . . . Public Health Law § 2164, or successor law, and . . . have such additional immunizations as the Department may require" (former NY City Health Code [24 RCNY] §§ 43.17 [a] [2]; 47.25 [a] [2]). In December 2013, following a public hearing and comment period, the Board amended Health Code §§ 43.17 and 47.25, as relevant here, to provide that all children between the ages of 6 months and 59 months who attend child care or school-based programs under the Department's jurisdiction must also receive annual influenza vaccinations (see NY City Health Code [24 RCNY] §§ 43.17 [a] [2] [B] [i]; 47.25 [a] [2] [B] [i]). As with the other required vaccinations, a child may be exempt from the flu vaccine requirement upon a physician's certification or on the basis of "genuine and sincere religious beliefs" held by the child's parent or guardian (NY City Health Code [24 RCNY] §§ 43.17 [a] [2] [B] [i]; 47.25 [a] [2] [B] [i]). The Board's amendments authorized officials in charge of child care and school programs to deny admission to any child who fails to provide proof of influenza vaccination and established an appeals process for those denied admission on that ground (see id. §§ 43.17 [a] [2] [B] [ii]; 47.25 [a] [2] [B] [ii]). Under the new flu vaccine rules, a child care provider or school "that fails to maintain documentation showing that each child in attendance has either received each vaccination required by this subdivision or is exempt from such a requirement . . . will be subject to fines" for each unvaccinated child permitted entry (id. § 43.17 [a] [2] [C]; see id. § 47.25 [a] [2] [C]).
Petitioners—parents of children enrolled in child care programs subject to the flu vaccine rules who object to their children receiving the vaccination—commenced this hybrid CPLR article 78 proceeding and declaratory judgment action to enjoin respondents from enforcing the flu vaccine rules or, alternatively, to have the court declare such rules invalid. Petitioners maintained that the Board's adoption of those rules{**31 NY3d at 607} exceeded its regulatory authority and violated the separation of powers doctrine. Petitioners also argued that the flu vaccine rules were preempted by [*3]the Public Health Law and that only the state legislature may mandate vaccinations for school children. Respondents cross-moved to dismiss the petition.
Supreme Court granted petitioners' motion, denied respondents' cross motion, and permanently enjoined respondents from enforcing the flu vaccine rules (2015 NY Slip Op 32601[U] [Sup Ct, NY County 2015]). The court held that the "New York State Legislature retains the statutory authority to mandate vaccinations not already expressed within the Public Health Law," and that "[r]espondents['] actions in enacting the [flu vaccine rules] are not contemplated in the statute and are outside of the law" (id. at *7).
On respondents' appeal, the Appellate Division affirmed, but employed different reasoning, concluding that "[t]he motion court improperly found that the Board of Health's adoption of the challenged [flu vaccine rules] was preempted by state law" (144 AD3d 59, 65 [1st Dept 2016]). According to the Appellate Division, "[t]here is no field preemption here because the State has not assumed full regulatory responsibility over the entire field of disease control and vaccination" and, further, "[t]he absence of the flu vaccination from the mandated list does not present a conflict because [Public Health Law § 2164] contains no language prohibiting localities from requiring additional vaccinations not mandated by the State" (144 AD3d at 65, 67).
Nevertheless, the Appellate Division held that the flu vaccine rules were invalid as enacted, under the analysis set forth in Boreali v Axelrod (71 NY2d 1 [1987]) and its progeny, because the "particular scheme adopted by the Board . . . exceeded the scope of its regulatory authority" (144 AD3d at 62). The Court clarified, however, that it was not holding that the Board lacked the authority to mandate vaccination of young children, given that section 17-109 of the Administrative Code of the City of New York empowers the Department to "take measures, and supply agents and offer inducements and facilities for general and gratuitous vaccination" (Administrative Code of City of NY § 17-109 [a], [b]; see 144 AD3d at 71-72). Rather, the Appellate Division emphasized, its "only holding" was that "the particular scheme" adopted by the Board "involved improper policy decisions, and thus did not constitute appropriate rulemaking" (144 AD3d at 72).
{**31 NY3d at 608}We granted respondents leave to appeal (28 NY3d 913 [2017]), and now reverse.
II. Separation of Powers
Respondents argue that the Appellate Division erred in concluding that the Board violated the separation of powers doctrine by adopting the flu vaccine rules. More specifically, respondents contend that the legislature has delegated to the Board, through Administrative Code § 17-109, the necessary authority to promulgate rules relating to vaccinations, including those challenged here. Respondents further assert that the Appellate Division inappropriately applied the Boreali factors (71 NY2d at 11-14) to second-guess the manner in which the Board exercised its regulatory authority, instead of merely determining whether the Board possessed the requisite authority to promulgate the rules in the first instance. In response, petitioners argue that the Appellate Division correctly held that the Board exceeded its regulatory authority and impermissibly crossed the threshold into legislative policymaking.
" 'The concept of the separation of powers is the bedrock of the system of government adopted by this State in establishing three coordinate and coequal branches of government, each charged with performing particular functions' " (Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 178 [2016], quoting Matter of Soares v Carter, 25 NY3d 1011, 1013 [2015]). This principle, "implied by the separate grants of power to each of the coordinate branches of government, requires that the Legislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies" (Bourquin v Cuomo, 85 NY2d 781, 784 [1995] [internal quotation marks and citations omitted]; see NY Const, art III, § 1; art IV, § 1).
Separation of powers challenges often involve the question of whether a regulatory body has exceeded the scope of its delegated powers and encroached upon the legislative domain of policymaking (see Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 608 [2015]). However, the distinction between unauthorized policymaking and permissible regulating is not always an easy one to define. The powers of the legislative and executive branches "cannot be neatly divided into isolated pockets" (Bourquin, 85 NY2d at 784). A regulatory agency "is clothed with those powers expressly conferred by its authorizing statute, as well as those{**31 NY3d at 609} required by necessary implication" (Matter of Acevedo v New York State Dept. of Motor Vehs., 29 NY3d 202, 221 [2017]; see Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249, 254 [2004]). Generally, "an agency can adopt regulations that go beyond the text of [its enabling] legislation, provided they are not inconsistent with the statutory language or its underlying purposes" (Matter of General Elec. Capital Corp., 2 NY3d at 254). The guiding legislation "need not be detailed or precise as to the agency's role" and, [*4]as an overarching principle, "common sense must be applied when reviewing a separation of powers challenge" (Greater N.Y. Taxi Assn., 25 NY3d at 609).
In Boreali and subsequent cases, we have clarified the "difficult-to-define line between administrative rule-making and legislative policy-making" by articulating four "coalescing circumstances" relevant to rendering such a determination (71 NY2d at 11; see Matter of Acevedo, 29 NY3d at 222; Greater N.Y. Taxi Assn., 25 NY3d at 610; Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d 681, 696 [2014]). These circumstances are: whether (1) the regulatory agency " 'balanc[ed] costs and benefits according to preexisting guidelines,' or instead made 'value judgments entail[ing] difficult and complex choices between broad policy goals to resolve social problems' " (Matter of Acevedo, 29 NY3d at 222-223, quoting Greater N.Y. Taxi Assn., 25 NY3d at 610); (2) the agency "merely filled in details of a broad policy or if it 'wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance' " (Matter of NYC C.L.A.S.H., 27 NY3d at 182, quoting Greater N.Y. Taxi Assn., 25 NY3d at 611); (3) the legislature had unsuccessfully attempted to enact laws pertaining to the issue (see Boreali, 71 NY2d at 13); and (4) the agency used special technical expertise in the applicable field (see id. at 13-14).
We have emphasized that these circumstances or factors are not "discrete, necessary conditions that define improper policymaking by an agency" or "criteria that should be rigidly applied in every case in which an agency is accused of crossing the line into legislative territory" (Matter of New York Statewide Coalition, 23 NY3d at 696; see Matter of NYC C.L.A.S.H., 27 NY3d at 180). "Rather, the factors are related considerations, designed to ascertain whether an agency has transgressed the bounds of permissible rulemaking" (Matter of Acevedo, 29 NY3d{**31 NY3d at 610} at 222; see Greater N.Y. Taxi Assn., 25 NY3d at 612). Ultimately, "[a]ny Boreali analysis should center on the theme that 'it is the province of the people's elected representatives, rather than appointed administrators, to resolve difficult social problems by making choices among competing ends' " (Matter of New York Statewide Coalition, 23 NY3d at 697, quoting Boreali, 71 NY2d at 13).
Turning to the case before us, the New York City Charter empowers the Department with "jurisdiction to regulate all matters affecting health in the city of New York and to perform all those functions and operations performed by the city that relate to the health of the people of the city" (NY City Charter § 556), as well as to "supervise the reporting and control of communicable and chronic diseases and conditions hazardous to life and health" (id. § 556 [c] [2]). In addition, the City Charter authorizes the Board to "add to and alter, amend or repeal any part of the health code, . . . [to] publish additional provisions for security of life and health in the city and [to] confer additional powers on the [D]epartment not inconsistent with the constitution, laws of this state or this charter" (id. § 558 [b]). The Board "may embrace in the health code all matters and subjects to which the power and authority of the [D]epartment extends" (id. § 558 [c]), and may enforce the Health Code through, among other things, "fines, penalties, [and] forfeitures" (id. § 558 [b]). Although these are broad delegations of power, we have held that they nevertheless "reflect[ ] only a regulatory mandate, not legislative authority" (Matter of New York Statewide Coalition, 23 NY3d at 694). Accordingly, "the Board's authority, like that of any other administrative agency, is restricted to promulgating 'rules necessary to carry out the powers and duties delegated to it by or pursuant to federal, state or local law' " (id. at 695, quoting NY City Charter § 1043 [a]). "A rule has the force of law, but it is not a law; rather, it 'implements or applies law or policy' " (Matter of New York Statewide Coalition, 23 NY3d at 695, quoting NY City Charter § 1041 [5] [i]), and the Board must act within the strictures of its legislatively-delegated powers.
In that regard, as particularly relevant here, Administrative Code § 17-109 delegates to the Department—and, by extension, the Board (see NY City Charter § 558 [c])—the power "to collect and preserve pure vaccine lymph or virus, produce diphtheria antitoxin and other vaccines and antitoxins, and add necessary additional provisions to the health code in order{**31 NY3d at 611} to most effectively prevent the spread of communicable diseases" (Administrative Code § 17-109 [a]). Section 17-109 further authorizes the Board to "take measures, and supply agents and offer inducements and facilities for general and gratuitous vaccination, disinfection, and for the use of diphtheria antitoxin and other vaccines and antitoxins" (id. § 17-109 [b]). Plainly, this is a legislative delegation of authority to adopt vaccination measures. Nonetheless, petitioners maintain that the flu vaccine rules exceed the scope of the Board's authority under Boreali.
(A)
 Analyzing the first Boreali factor, we must consider whether the flu vaccine rules are the result of the Board making difficult and complex value judgments, choosing between competing policy goals. Petitioners assert that the Board's improper policymaking is evidenced by the so-called "exceptions" inherent in its chosen scheme insofar as [*5]the flu vaccine rules apply only to those child care providers regulated by the City and providers are permitted to admit unvaccinated children, albeit subject to significant financial penalties. In that regard, petitioners liken the flu vaccine rules to the rules at issue in Matter of New York Statewide Coalition (23 NY3d at 690) capping the portion size of sugary drinks. This analogy is inapt.
In Matter of New York Statewide Coalition, the Board weighed the public health goal sought to be achieved by its regulation limiting the size of sugary drinks sold by certain food service establishments against various special interests, including "the economic consequences associated with restricting profits by beverage companies and vendors, tax implications for small business owners, and personal autonomy with respect to the choices of New York City residents concerning what they consume" (id. at 698). While we held that the agency's weighing of these economic considerations supported the view that it had transgressed into policymaking, we clarified that, generally, "the promulgation of regulations necessarily involves an analysis of societal costs and benefits," and that "Boreali should not be interpreted to prohibit an agency from attempting to balance costs and benefits" (Matter of New York Statewide Coalition, 23 NY3d at 697-698). However, under the facts presented there, we concluded that "the [p]ortion [c]ap [r]ule embodied a compromise that attempted to promote a{**31 NY3d at 612} healthy diet without significantly affecting the beverage industry," which constituted a balancing of competing special interests that fell within the legislative domain (id. at 698). We, therefore, held that the first factor weighed against the Board.
Here, by comparison, the Board did not choose between the competing public policies of advancing public health and avoiding economic disruption of specific industries (compare id. at 698-699). Rather, the legislature chose the "end" of public health and the "means" to promote that end by empowering the Board to "add necessary additional provisions to the health code in order to most effectively prevent the spread of communicable diseases," as well as to "take measures, and supply agents and offer inducements and facilities for general and gratuitous vaccination" (Administrative Code § 17-109 [a], [b]). In adopting the flu vaccine rules, the Board determined, in accordance with the legislature's mandates, which vaccines should be required for children attending certain day care programs, as a matter of public health.
Undisputedly, there is a very direct connection between the flu vaccine rules and the preservation of health and safety (compare Matter of New York Statewide Coalition, 23 NY3d at 699; see generally Matter of Viemeister, 179 NY 235 [1904]). To be sure, the flu vaccine rules necessarily impinge upon personal choice to some degree. This will almost always be true with health-related regulations. Notably, however, unlike in Matter of New York Statewide Coalition, the rules challenged here do not relate merely to a personal choice about an individual's own health but, rather, seek to ensure increased public safety and health for the citizenry by reducing the prevalence and spread of a contagious infectious disease within a particularly vulnerable population.
That the Board determined the exact means of achieving and advancing the larger end chosen by the legislature—by imposing fines to ensure that the cost of admitting unvaccinated, nonexempt children to day care programs is too significant for a provider to risk noncompliance—is a necessary part of the Board's exercise of its regulatory authority; it does not give rise to a violation of the separation of powers doctrine. Nor does application of the flu vaccine rules to only those day care programs primarily regulated by the City—not those primarily subject to state oversight—warrant a contrary conclusion. There is no indication that the Board limited the scope of the{**31 NY3d at 613} rules based on financial considerations of special or business interests (see Matter of NYC C.L.A.S.H., 27 NY3d at 181 n 5 [scope of regulation did not indicate policymaking where it merely regulated areas under the agency's jurisdiction]; compare Boreali, 71 NY2d at 11-12 [invalidating "a regulatory scheme laden with exceptions based solely upon economic and social concerns" (emphasis added)]). Moreover, "the limited scope of the [flu vaccine rules] would not in itself demonstrate that [they] amounted to policymaking" (Matter of New York Statewide Coalition, 23 NY3d at 698 n 3). Accordingly, our analysis of the first Boreali factor militates in favor of upholding the flu vaccine rules.
(B)
With regard to the second Boreali factor, as noted above, the legislature has delegated significant power to the Board to promulgate regulations in the field of public health. Indeed, as already observed, the Board has jurisdiction to regulate "all matters affecting health in the city of New York" (NY City Charter § 556), including matters relating to "communicable and chronic diseases and conditions hazardous to life and health" (id. § 556 [c] [2]). Further, Administrative Code § 17-109 specifically delegates to the Board the power to regulate vaccinations and adopt vaccination measures to reduce the spread of infectious disease. This provision traces back to an 1866 act of the state legislature creating a predecessor to the existing Department and Board, which empowered that predecessor agency to "take measures and supply agents, and afford inducements and facilities for general and gratuitous vaccination and [*6]disinfection . . . as in its opinion the protection of the public health may require" (L 1866, ch 74, §§ 16, 20). Over the course of many decades, the State has repeatedly reaffirmed the authority of the Department (in its various forms) to regulate vaccinations (see L 1874, ch 635, § 1; L 1897, ch 378, § 1225 [established New York City Charter and Board of Health, and bestowed upon Board the power to "take measures, and supply agents and offer inducements and facilities for general and gratuitous vaccination"]; L 1901, ch 466, § 1225; L 1937, ch 929, § 556-6.0 [enacted the New York City Administrative Code with vaccination provision]).
In accordance with these statutory delegations, the Board has mandated smallpox vaccinations of minors since 1866 (see former Metropolitan Bd of Health Code of Health Ordinances{**31 NY3d at 614} § 29 [1866]), and has required other vaccines for children enrolled in city-regulated day care centers since at least as early as 1948, when it directed that children be immunized against diphtheria prior to admission (see former NYC Sanitary Code § 198, Regulation 6 [1948]). These requirements were expanded over the years to add a number of other mandatory vaccinations, including poliomyelitis, tetanus, and pertussis (former Health Code § 47.07 [1959]). Critically, this preceded the state legislature's own foray into mandatory vaccinations for children enrolled in day care programs. Prior to 1966, when the legislature enacted Public Health Law § 2164 (see L 1966, ch 994), smallpox was the only vaccine mandated by the legislature on a state level. The first iteration of section 2164, itself, mandated only that children receive poliomyelitis vaccines (see L 1966, ch 994). Nonetheless, in the legislative history underlying section 2164, the legislature expressly recognized that the New York City Health Code already required children admitted to a day care program regulated by the City to be vaccinated against poliomyelitis, diphtheria, pertussis, and tetanus (see Assembly Mem in Support, Bill Jacket, L 1966, ch 994 at 8).[FN3] Similarly, later amendments to section 2164 reflect the state legislature's awareness that the Board continued to mandate vaccinations beyond the confines of section 2164 (see e.g Sponsor's Mem, Bill Jacket, L 1989, ch 538 at 8).
In light of the state legislature's aforementioned delegations to the Board of the power to regulate vaccines, together with the Board's long history of mandating immunizations for children attending city-regulated child care programs beyond those required by the legislature, there can be no serious claim that, in enacting the flu vaccine rules, the Board " 'wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance' " (Matter of NYC C.L.A.S.H., 27 NY3d at 182, quoting Greater N.Y. Taxi Assn., 25 NY3d at 611; see Rent Stabilization Assn. of N.Y. City v Higgins, 83 NY2d 156, 170 [1993], cert denied 512 US 1213 [1994]). "Where an agency has promulgated regulations in a particular area for an extended time without any interference from the legislative body, we can infer, to some degree, that the legislature approves of the agency's interpretation or action" (Greater N.Y. Taxi Assn., 25 NY3d at 612).{**31 NY3d at 615}
Nor can it be said that there was a complete absence of any "legislative articulation of health policy goals" (Matter of New York Statewide Coalition, 23 NY3d at 700) concerning the relevant subject matter. To the contrary, the state legislature has accepted that vaccinations are a viable method of curbing the spread of disease (see Public Health Law §§ 2164, 2165), enacted legislation to promote the administration of influenza vaccinations in youth populations (see id. § 613 [1] [b]), and delegated to the Board the authority to take measures to vaccinate gratuitously (see Administrative Code § 17-109 [a], [b]). Under these circumstances, the second Boreali factor strongly supports the Board's position.
(C)
As for the third Boreali factor, the question of legislative inaction, the parties do not identify any attempt by the New York City Council to legislate whether the influenza vaccine should be mandatory for children attending child care programs regulated by the Department. It is true that the state legislature has generally adopted an incremental approach to imposing vaccination requirements for children and has enacted legislation that encourages, but does not require, that children receive the influenza vaccination (see L 2010, ch 36, § 1; Public Health Law § 613 [1]). However, this is hardly the equivalent of "repeated failures by the [l]egislature to [reach] an agreement" on the subject matter "in the face of substantial public debate and vigorous lobbying by a variety of interested factions" (Boreali, 71 NY2d at 13). In any event, as we have previously recognized, " '[l]egislative inaction, because of its inherent ambiguity, affords the most dubious foundation for drawing positive inferences' " (Matter of NYC C.L.A.S.H., 27 NY3d at 184, quoting Matter of Oswald N., 87 NY2d 98, 103 n 1 [1995]). Accordingly, we conclude that the third factor does not weigh against the Board.
[*7](D)
Likewise, the fourth Boreali factor, which looks to "whether the agency used special expertise or competence in the field to develop the challenged regulations" (Greater N.Y. Taxi Assn., 25 NY3d at 612, citing Boreali, 71 NY2d at 13-14), does not counsel us to invalidate the flu vaccine rules. In debating the virtues of the proposed rules, the Board compiled data and research regarding the prevalence and severity of influenza in{**31 NY3d at 616} the infant population, the effectiveness and safety of the vaccine, and the benefits to the greater population of mandating the vaccination of young children. The Board explained that the flu vaccine rules are supported by research indicating that children have "the highest attack rates of influenza," "serve as a major source of transmission within communities," and, further, that "[v]accinating children produces 'herd immunity' in the general population." The Board also relied on the recommendation of the Federal Advisory Committee on Immunization Practices that everyone over the age of six months receive an annual influenza vaccination, and considered similar vaccination requirements in other states for children attending child care or preschool facilities. Unquestionably, the Board's health expertise was essential to its determination of whether to require the influenza vaccination. Further, while the Board's selection of financial penalties for noncompliance was less reliant on its technical competence in the health field, it is consistent with the Board's regulatory authority to choose among various enforcement methods to best achieve compliance (see NY City Charter § 558 [b], [c]). Therefore, the final Boreali factor does not militate against the Board (see Matter of NYC C.L.A.S.H., 27 NY3d at 185; Greater N.Y. Taxi Assn., 25 NY3d at 612).
(E)
The legislature's specific delegation to the Board of authority over vaccinations and our analysis of the Boreali factors—two of which weigh heavily in the agency's favor and two of which do not weigh against it—compel the conclusion that the Board's adoption of the flu vaccine rules fits squarely within its regulatory authority and does not constitute impermissible policymaking. Accordingly, we reject petitioners' separation of powers challenge. In so holding, we emphasize that the Boreali analysis is not aimed at determining whether a regulatory agency adopted the most desirable method or type of regulation. Stated otherwise, the factors enumerated in Boreali are not designed to second-guess agency regulations that properly fall within the agency's purview. Rather, the Boreali analysis is intended only to aid courts in determining whether an agency has usurped the legislature's power by regulating in an area in which it has not been delegated rule-making authority. To be sure, this may entail some consideration of the manner in which the agency has chosen to regulate. However, if the{**31 NY3d at 617} Boreali factors indicate that the agency has been empowered to regulate the matter in question, the separation of powers analysis goes no farther in reviewing the agency's methods.
III. Preemption
Alternatively, petitioners argue that the flu vaccine rules are invalid because they conflict with the Public Health Law. Petitioners also claim that—despite its delegation of authority to the Board to regulate vaccinations—the state legislature has preempted the narrower field of mandatory school vaccinations by enacting a comprehensive statutory scheme. Respondents contend, in opposition, that their power to adopt vaccination requirements is both consistent with, and derived from, state law and, therefore, the flu vaccine rules are not preempted.
"The preemption doctrine represents a fundamental limitation on home rule powers" and "embodies 'the untrammeled primacy of the [l]egislature to act . . . with respect to matters of State concern' " (Albany Area Bldrs. Assn. v Town of Guilderland, 74 NY2d 372, 377 [1989], quoting Wambat Realty Corp. v State of New York, 41 NY2d 490, 497 [1977]). "A local law will be preempted either where there is a direct conflict with a state statute (conflict preemption) or where the legislature has indicated its intent to occupy the particular field (field preemption)" (Eric M. Berman, P.C. v City of New York, 25 NY3d 684, 690 [2015]; see DJL Rest. Corp. v City of New York, 96 NY2d 91, 95 [2001]).
"We have held that a local law is inconsistent [with state law] 'where local laws prohibit what would be permissible under [s]tate law, or impose prerequisite additional restrictions on rights under [s]tate law, so as to inhibit the operation of the State's general laws' " (Eric M. Berman, P.C., 25 NY3d at 690, quoting Zakrzewska v New School, 14 NY3d 469, 480 [2010]). However, we have also cautioned that reading conflict preemption principles too broadly risks rendering the power of local governments illusory (see New York State Club Assn. v City of New York, 69 NY2d 211, 221 [1987], affd 487 US 1 [1988]). Thus, the "fact that both the [s]tate and local laws seek to regulate the same subject matter does not in and of itself give rise to an express conflict" (Jancyn Mfg. Corp. v County of Suffolk, 71 NY2d 91, 97 [1987]; see People v Judiz, 38 NY2d 529, 531 [1976]), and conflict preemption is generally [*8]found only "when the State specifically permits the conduct prohibited at the local level" or there is some other indication that deviation{**31 NY3d at 618} from state law is prohibited (New York State Club Assn., 69 NY2d at 222).
As for field preemption, "[t]he [s]tate [l]egislature may expressly articulate its intent to occupy a field, but it need not. It may also do so by implication" (DJL Rest. Corp., 96 NY2d at 95). "Intent to preempt the field may 'be implied from the nature of the subject matter being regulated and the purpose and scope of the [s]tate legislative scheme, including the need for [s]tate-wide uniformity in a given area' " (People v Diack, 24 NY3d 674, 679 [2015], quoting Albany Area Bldrs. Assn., 74 NY2d at 377). "When the State has created a comprehensive and detailed regulatory scheme with regard to the subject matter that the local law attempts to regulate, the local interest must yield to that of the State in regulating that field" (Diack, 24 NY3d at 677).
In support of their preemption claim, petitioners rely on Public Health Law §§ 206, 613, 2164, and 2165. Section 206 sets forth the general powers and duties of the Commissioner of the New York State Department of Health (NYSDOH), including the power to "establish and operate such adult and child immunization programs as are necessary to prevent or minimize the spread of disease and to protect the public health" (Public Health Law § 206 [1] [l]). That section further authorizes NYSDOH to "promulgate such regulations as are necessary for the implementation" of this mandate; however, the statute provides, in the same paragraph, that "[n]othing in this paragraph shall authorize mandatory immunization of adults or children, except as provided in sections [2164] and [2165]" (id. [emphasis added]).
Likewise, Public Health Law § 613 (1) (a) requires NYSDOH to "develop and supervise the execution of a program of immunization, surveillance and testing, to raise to the highest reasonable level the immunity of the children of the state against communicable diseases including . . . influenza" and several other enumerated diseases. Concerning influenza, in particular, Public Health Law § 613 (1) (b) mandates that the NYSDOH Commissioner "administer a program of influenza education to the families of children ages six months to eighteen years of age who attend licensed and registered day care programs" and schools within the state. According to the statute, NYSDOH should encourage and assist municipalities to "maintain local programs of immunization to raise the immunity of the children and adults of each municipality to the{**31 NY3d at 619} highest reasonable level, in accordance with an application for state aid submitted by the municipality and approved by the commissioner" (id. § 613 [1] [a]). Pursuant to section 613 (1) (c), NYSDOH is directed to invite and encourage participation in the educational programs by medical societies and organizations, parents, teachers, child care resource centers, other groups, and other state agencies. However, the statute again provides that "[n]othing in this subdivision shall authorize mandatory immunization of adults or children, except as provided in" Public Health Law §§ 2164 and 2165 (Public Health Law § 613 [1] [c] [emphasis added]). As previously discussed, Public Health Law §§ 2164 and 2165 set forth mandatory vaccinations that are preconditions to enrollment in school and in institutions of higher education. Those statutes include exemptions, incorporate an appeal process, and explain the procedures to be followed when a student is unable to afford the necessary vaccinations. Taking each of the aforementioned statutes into consideration, the Appellate Division correctly determined that the flu vaccine rules are not preempted by state law.
(A)
 Addressing conflict preemption first, nothing in Public Health Law § 2164 suggests that the list of vaccinations set forth therein is an exclusive one that may not be expanded by local municipalities to which the authority to regulate vaccinations has been delegated. Indeed, as noted above, the state legislature has long recognized the Board as a pioneer of mandatory immunizations of children and, to some degree, it modeled Public Health Law § 2164 on the New York City Health Code (see Assembly Mem in Support, Bill Jacket, L 1966, ch 994 at 8; see also Sponsor's Mem, Bill Jacket, L 1989, ch 538 at 8). In fact, NYSDOH expressed its recognition of the Board's independent authority as recently as 2015 (see Notice of Proposed Rule Making, NY Reg, Mar. 18, 2015 at 18 [observing that proposed amendments to state regulations concerning school immunization requirements "do not address additional immunizations that may be required for school admission by the New York City Health Code"]). Thus, the flu vaccine rules do not conflict with either section 2164 or section 2165.
Contrary to petitioners' assertions, the flu vaccine rules also do not conflict with Public Health Law §§ 206 and 613. Those provisions are directed to the powers and duties of the Commissioner{**31 NY3d at 620} of NYSDOH, not of the Board. Notably, the language relied on by petitioners—that nothing in the particular "subdivision" (Public Health Law § 613 [1] [c]) or "paragraph" "shall authorize mandatory immunization of adults or children, except as provided in sections [2164] and [2165]" of the Public Health Law—was added to those statutes in 2004, and the legislative history reveals [*9]no intent to restrict the Board's authority to regulate vaccinations (Public Health Law § 206 [1] [l]; see id. § 613 [1] [c]). Rather, the legislature intended to grant NYSDOH authority to oversee voluntary adult immunization programs, while ensuring that its grant of authority would not be construed as extending to the adoption of mandatory adult immunizations (see Letter from Richard N. Gottfried, Chair, Assembly Comm on Health, to Richard Platkin, Counsel to Governor, July 16, 2004, Bill Jacket, L 2004, ch 207 at 5, 2004 NY Legis Ann at 179). Indeed, by their plain language, these provisions simply make clear that the particular statutory subdivisions at issue do not authorize NYSDOH to adopt additional mandatory immunizations, but nothing therein prohibits the adoption of mandatory immunizations if otherwise authorized by law.
(B)
Turning to the question of field preemption, although the State has enacted a relatively comprehensive statutory scheme for school vaccinations, the relevant statutes reflect the state legislature's recognition that municipalities play a significant role in vaccination programs. It is not unusual for the State to set the floor for public health regulations while permitting localities to adopt stricter measures (see e.g. Public Health Law § 228 [3]).
"[T]he mere fact that the Legislature has enacted specific legislation in a particular field does not necessarily lead to the conclusion that broader agency regulation of the same field is foreclosed. The key question in all cases is what did the Legislature intend?" (Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation, 71 NY2d 186, 193 [1988]). Significantly, although Administrative Code § 17-109 is now codified as New York City legislation, it was originally enacted by the state legislature and "reflect[s] the policy of the State that" the Board has the authority to regulate vaccinations in New York City, including mandatory vaccinations of children enrolled in city-regulated child care programs (Matter of{**31 NY3d at 621} 
Patrolmen's Benevolent Assn. of City of N.Y., Inc. v New York State Pub. Empl. Relations Bd., 6 NY3d 563, 574 [2006]). Indeed, it would be difficult to reconcile the state legislature's repeated explicit recognition of the Board's independent vaccination requirements when amending Public Health Law § 2164, with an intent to implicitly repeal the Board's authority (see Sponsor's Mem, Bill Jacket, L 1989, ch 538 at 8; Bill Jacket, L 1966, ch 994; cf. Matter of Natural Resources Defense Council v New York City Dept. of Sanitation, 83 NY2d 215, 222 [1994] [repeal by implication will only be resorted to in the clearest of cases]; Matter of Consolidated Edison Co. of N.Y., 71 NY2d at 195 ["(r)epeal or modification of legislation by implication is not favored in the law"]). When codifying the Administrative Code in 1937, in fact, the state legislature specifically provided that no law enacted thereafter should be construed to implicitly repeal any provision of the Code, and the Code still so states (see former Administrative Code § 982-6.0 as enacted by L 1937, ch 929, § 1; Administrative Code § 1-110). Accordingly, we cannot conclude that the State has preempted the field of mandatory school vaccinations so as to invalidate the Board's flu vaccine rules.
IV. Conclusion
For all of these reasons, we hold that the Board permissibly adopted the flu vaccine rules pursuant to its legislatively-delegated and long-exercised authority to regulate vaccinations. We also hold that neither field, nor conflict, preemption abrogates the rules. Therefore, the order of the Appellate Division should be reversed, with costs, the petition insofar as it sought to enjoin enforcement of the amendments to the New York City Health Code denied, and judgment granted declaring in respondents' favor in accordance with this opinion.[FN4]
Chief Judge DiFiore and Judges Rivera, Fahey, Garcia, Wilson and Feinman concur.
Order reversed, with costs, petition insofar as it sought to enjoin enforcement of the amendments to the New York City Health Code denied, and judgment granted declaring in respondents' favor in accordance with the opinion herein.

Footnotes

Footnote 1:The Board of Health—which is within the Department of Health and Mental Hygiene—is chaired by the Commissioner of the Department and is comprised of 10 other members appointed by the mayor, five of whom must be medical doctors, and the remaining five of whom must have at least a master's degree in a science-related field, in addition to 10 years of relevant experience (see NY City Charter § 553 [a]). Significantly, the New York City Charter authorizes the Board to "add to and alter, amend or repeal any part of the health code" concerning "all matters and subjects to which" the Department's authority extends and to "publish additional provisions for security of life and health in the city" (id. § 558 [b], [c]).

Footnote 2:Public Health Law § 2165 sets forth similar immunization requirements, and statutory exceptions, for college students.

Footnote 3:Vaccinations for pertussis and tetanus were not mandated by state law until 2004 (see L 2004, ch 207).

Footnote 4:Because petitioners sought a declaration of the parties' rights, a declaration in respondents' favor rather than a dismissal of the petition is appropriate (see 200 Genesee St. Corp. v City of Utica, 6 NY3d 761 [2006]; Lanza v Wagner, 11 NY2d 317 [1962]).