# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 45
In the Matter of Owner Operator
Independent Drivers Association,
Inc., et al.,
     Appellants,
   v
New York State Department of
Transportation et al.,
     Respondents.

Charles R. Stinson, for appellants.
Kevin C. Hu, for respondents.

TROUTMAN, J.:

Before us is a facial challenge to the constitutionality of New York regulations

adopting a rule promulgated by the Federal Motor Carrier Safety Administration requiring

the installation of electronic logging devices in commercial motor vehicles. We hold that

- 1 -

the warrantless inspections authorized by the regulations fall within the administrative search exception to the warrant requirement and do not constitute unreasonable searches and seizures under article I, § 12 of the State Constitution.

I.

For over 80 years, New York has enforced hours-of-service limitations and record-keeping requirements for commercial vehicle drivers (*see e.g. People v Yarbrough*, 168 Misc 769, 769-770 [NY City Magistrate's Ct 1938]).  The aim of New York's 1937 hours-of-service statute was essentially the same as the aim of our current federal and State regulations:  "protect[ing] operators of motor trucks and buses as well as the public generally from the dangers incident to fatigue of drivers" (*Yarbrough*, 168 Misc at 770).  Those hours-of-service requirements were "the outgrowth of long and tragic experience with accidents on the highways of this and of other States," since "[t]he fatalities resulting from overwork of motor truck drivers is common knowledge and needs no elaboration" (*id*.).

In 1938, a federal law took effect empowering a predecessor agency of the Federal Motor Carrier Safety Administration (FMCSA) to establish and enforce federal safety standards for commercial motor vehicles (CMVs) and their drivers (*see id*. at 771, citing 49 USC § 301, *et seq*.; *see also* 49 CFR subtit B, Ch III, subch B).  To encourage states' cooperation in enforcing these federal safety standards, FMCSA provides grants to states such as New York that incorporate the federal rules into state law and assist in enforcing those rules pursuant to the Motor Carrier Safety Assistance Program (*see* 49 USC § 31102).

The New York Department of Transportation (DOT) is the agency primarily responsible for New York's enforcement of the FMCSA regulations. Its responsibilities include enforcing regulations limiting a CMV operator's maximum number of hours of service (*see* 49 CFR part 395; 17 NYCRR 820.6).

Under the FMCSA regulations adopted by this State, CMV operators must record their hours of service and duty status, in addition to other relevant data, and produce those records for inspection when requested by the police or other authorized official (*see* NY Transportation Law § 212; 17 NYCRR 820.6; 820.12 [a]). Historically, CMV operators documented this information using paper records or automatic on-board recording devices. However, in 2012, Congress passed legislation requiring the federal DOT to prescribe regulations requiring CMVs, involved in interstate commerce and operated by drivers subject to the hours-of-service and record-of-duty-status requirements, to be equipped with electronic logging devices (ELDs) (*see* 49 USC § 31137 [a]). An ELD integrates with the vehicle's engine and uses global positioning system (GPS) technology to record, among other things, geographic location, engine hours, and mileage of CMVs, along with the date and time (*see* 49 CFR 395.26). The driver must manually input certain other information, including changes in their duty status (e.g., "Off duty," "Sleeper berth," "Driving," and "On-duty not driving") (*see* 49 CFR 395.8, 395.15). When a driver is on duty, an ELD automatically records a CMV's geographic location to within a half-mile radius (*see* 49 CFR part 395, subpart B, Appendix A, 4.3.1.6 [c]). When the CMV is operated for personal use, the device must be programmed to leave blank the engine hours and vehicle miles and

to degrade the geographic location information captured by the device to within approximately a 10-mile radius (*see* 49 CFR 395.26 [d] [2]).

Upon request by law enforcement personnel during roadside safety inspections, the driver is required to produce and transfer to the officer the ELD hours-of-service records data (*see* 49 CFR 395.24 [d]). This transfer occurs digitally (via web services, email, USB, or Bluetooth) and neither requires the driver to exit the vehicle nor the officer to enter the vehicle (*see* 49 CFR part 395, subpart B, Appendix A, 4.10.1).

The FMCSA promulgated the final ELD rules in 2015, requiring ELDs to be installed and in use by December 18, 2017, with some exceptions (*see* 49 CFR 395.8; *see also* 80 Fed Reg 78292). New York adopted the ELD rule as an emergency measure under the State Administrative Procedure Act. The emergency rules were permanently incorporated into New York law on April 9, 2019, and made effective April 24, 2019 (*see* NY Reg, Apr. 24, 2019 at 39). This made New York the 48th state to adopt the rule (*see id.*).

## II.

Prior to commencing this proceeding, petitioner Owner Operator Independent Drivers Association, Inc. (Association), a not-for-profit corporation whose members own and operate CMVs, challenged the federal ELD rule in federal court on various grounds, including that the warrantless inspection of ELD data constituted an unreasonable search and seizure under the Fourth Amendment of the U.S. Constitution. The United States Court of Appeals for the Seventh Circuit rejected the Association's challenge, holding that the commercial trucking industry was a pervasively regulated industry and therefore, even if

the ELD rule constituted a search or seizure, it would be reasonable under the Fourth Amendment's exception for such industries (*Owner-Operator Ind. Drivers Assn., Inc. v United States Dept. of Transp.* [*Owner-Operator*], 840 F3d 879, 892-893 [7th Cir 2016], *cert denied* 137 S Ct 2246 [2017]).

The Association then commenced a class action in New York state court, asserting that the federal ELD rule was being improperly enforced prior to its incorporation into state law and that its enforcement violated CMV drivers' rights to due process and to be free from unreasonable searches and seizures under New York's Constitution. Supreme Court granted summary judgment dismissing the complaint (*Owner Operator Ind. Drivers Assn., Inc. v Karas* [*Karas*], 62 Misc 3d 909, 924 [Sup Ct, Albany County 2018, Platkin, J.], *appeal dismissed* 188 AD3d 1313 [3d Dept 2020]). The court found no evidence that the State was enforcing the ELD rule at that time (*see id*. at 918-921). Instead, the State was conducting roadside inspections under its extant authority to enforce the existing hours-of-service requirements (*see id*.). The court further held that the State's limited roadside inspections of ELDs, for the sole purpose of ensuring compliance with pre-existing hours-of-service requirements, did not constitute unreasonable searches and seizures under New York's Constitution (*see id*. at 922-923).

The Association appealed. Because New York adopted the ELD rule during the pendency of the appeal, the Appellate Division dismissed the appeal as moot (*Karas*, 188 AD3d at 1316).

The Association and three current or former CMV operators (petitioners) then commenced this combined CPLR article 78 proceeding and declaratory judgment action

(proceeding) against defendants-respondents DOT and other agencies (respondents) challenging New York's adoption of the ELD rule. Supreme Court granted respondents' motion to dismiss the suit, holding in relevant part that searches authorized by the ELD rule are valid under the exception to the warrant requirement for administrative searches (2020 NY Slip Op 34831[U] [Sup Ct, Albany County 2020, Cholakis, A.J.]).

The Appellate Division affirmed. The Court held that "commercial trucking is a pervasively regulated industry pursuant to which an administrative search may be justified" and that the ELD rule furthers "a vital and compelling interest" in highway safety (205 AD3d 53, 60 [3d Dept 2022, McShan, J.] [internal quotation marks omitted]).

In reaching that conclusion, the Appellate Division relied on the FMCSA's estimation "that 755 fatalities and 19,705 injuries occur each year because of 'drowsy, tired, or fatigued CMV drivers' " (*id*. at 60-61, quoting 65 Fed Reg 25540 [May 2, 2000]). The Court further relied on "[t]he factual findings made by the FMCSA in connection with its rulemaking," which "revealed that the prior system of documenting hours of service through paper records was inadequate due to the widespread and longstanding problem of falsification of such records" (*id*. at 61, citing 65 Fed Reg at 25540, 25558). The Appellate Division emphasized that, "[d]uring the public listening sessions held prior to enactment of the final rule, drivers stated that motor carriers sometimes pressured them to alter their paper records" (*id*., quoting 80 Fed Reg 78292, 78320, 78323, 78325 [Dec. 16, 2015]). The Court further noted the obvious fact that "paper records are also vulnerable to human error" (*id*., citing 80 Fed Reg at 78303).

Petitioners appealed to this Court as of right (*see* CPLR 5601 [b] [1]). We agree with the lower courts that the ELD rule satisfies the administrative search exception to the warrant requirement. And so we modify the order of the Appellate Division solely to declare the ELD rule facially constitutional inasmuch as it does not violate article I, § 12 of the State Constitution.[1]

### III.

Generally, a party making a facial challenge to a regulation has the "extraordinary burden . . . of proving beyond a reasonable doubt that the challenged provision 'suffers wholesale constitutional impairment' " (*Brightonian Nursing Home v Daines*, 21 NY3d 570, 577 [2013]; *see Matter of Independent Ins. Agents & Brokers of N.Y., Inc. v New York State Dept. of Fin. Servs.*, 39 NY3d 56, 64-65 [2022]). Thus, a facial challenge must fail so long as there are circumstances under which the challenged provision "could be constitutionally applied" (*Matter of Moran Towing Corp. v Urbach*, 99 NY2d 443, 445 [2003]). "In other words, 'the challenger must establish that no set of circumstances exists under which the Act would be valid' " (*id*. at 448).

However, because here respondents moved to dismiss the proceeding, they bore the burden of demonstrating that, "[e]ven treating all allegations in the [petition] as true and affording [petitioners] every possible favorable inference, . . . the [ELD rule] is [facially]

---

[1] The Appellate Division affirmed Supreme Court's dismissal of the petition. However, "[b]ecause petitioners sought a declaration of the parties' rights, a declaration in respondents' favor rather than a dismissal of the petition is appropriate" (*Garcia v New York City Dept. of Health & Mental Hygiene*, 31 NY3d 601, 621 n 4 [2018]).

constitutional" (*American Economy Ins. Co. v State of New York*, 30 NY3d 136, 149 [2017]). We conclude that respondents met their burden.

Both "[t]he 4th Amendment of the United States Constitution and article I, § 12 of our State Constitution protect individuals from unreasonable government intrusions into their legitimate expectations of privacy" (*People v Quackenbush*, 88 NY2d 534, 541 [1996] [internal quotation marks omitted]). Under both federal and New York law, " 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions' " (*Los Angeles v Patel*, 576 US 409, 419 [2015], quoting *Arizona v Gant*, 556 US 332, 338 [2009]; *see People v Weaver*, 12 NY3d 433, 444 [2009]). This warrant requirement applies to commercial premises and encompasses administrative inspections designed to enforce a regulatory scheme because such searches are "significant intrusions upon the interests protected" by the State and Federal Constitutions (*Camara v Municipal Court of City & County of San Francisco*, 387 US 523, 534 [1967]; *see Quackenbush*, 88 NY2d at 541-542; *People v Keta*, 79 NY2d 474, 498 [1992]).

Here petitioners' claim is based solely on New York's Constitution, which "we have on many occasions interpreted . . . to provide greater protections where circumstances warrant and have developed an independent body of state law in the area of search and seizure" (*Weaver*, 12 NY3d at 445). Our reasons for affording our State's citizens greater protections are just as valid now as ever before:

> "Although the language of the State and Federal constitutional proscriptions against unreasonable searches and seizures generally tends to support a policy of uniformity, we have not

hesitated in the past to interpret article I, § 12 of the State Constitution independently of its Federal counterpart when necessary to assure that our State's citizens are adequately protected from unreasonable governmental intrusions. An independent construction of our own State Constitution is particularly appropriate where a sharp or sudden change in direction by the United States Supreme Court dramatically narrows fundamental constitutional rights that our citizens have long assumed to be part of their birthright" (*Keta*, 79 NY2d at 496-497 [citations omitted]).

One established exception to the warrant requirement under New York's constitutional jurisprudence provides that "[w]arrantless administrative searches may be upheld in the limited category of cases where" two requirements are met (*Quackenbush*, 88 NY2d at 541).[2] The first requirement is that "the activity or premises sought to be inspected is subject to a long tradition of pervasive government regulation" (*Quackenbush*, 88 NY2d at 541). The second requirement is that the regulatory scheme authorizing the search must "delineate rules to guarantee the 'certainty and regularity of . . . application' necessary to provide a 'constitutionally adequate substitute for a warrant' " (*Keta*, 79 NY2d at 499; *see Quackenbush*, 88 NY2d at 542).

New York's heightened protection against unreasonable searches and seizures under article I, § 12, however, requires that we take our analysis of these two requirements a step further. Regarding the first requirement for the administrative search exception, we must examine the regulatory scheme authorizing the search to ascertain if the scheme is truly

---

[2] These two requirements parallel in many respects the U.S. Supreme Court's test for determining whether the administrative search exception to the Fourth Amendment's warrant requirement is applicable (*compare Quackenbush,* 88 NY2d at 541 *with New York v Burger*, 482 US 691, 699 [1987]).

geared towards administrating a pervasively regulated industry rather than being a mere pretext that is, " 'in reality, designed simply to give the police an expedient means of enforcing penal sanctions' " (*see Keta*, 79 NY2d at 498-499). Even if the regulatory scheme as a whole is not a pretext for expedient enforcement of penal sanctions, when analyzing the second requirement courts must determine whether the search authorized under the regulatory scheme is similarly pretextual inasmuch as the purpose of the search is "solely to uncover evidence of criminality," not to detect "real *administrative* violations" for the purpose of furthering the goals of the regulatory scheme (*id*. at 498, 500). We hold that the ELD rule meets both of the requirements for an administrative search, and it is not a pretext for uncovering criminality.

A.

Starting with the first requirement, petitioners correctly concede that there is a long tradition of commercial trucking being subject to comprehensive regulations. Regulation of commercial trucking, including regulation of "the maximum hours of service for commercial drivers," extends back more than eighty years both in New York and on the federal level (*Owner-Operator,* 840 F3d at 885-887; *see e.g. Yarbrough*, 168 Misc at 769-772). Those regulations are in keeping with this State's "vital and compelling interest in safety on the public highways" (*People v Ingle*, 36 NY2d 413, 419 [1975], citing Executive Law § 330).

CMV operators therefore have "a diminished expectation of privacy in the conduct of that business because of the degree of governmental regulation" (*Quackenbush*, 88 NY2d at 541), and "may reasonably be deemed to have relinquished a privacy-based

objection" to an "intrusion that will foreseeably occur incident" to applicable regulations (*Matter of Ford v New York State Racing & Wagering Bd.*, 24 NY3d 488, 498 [2014]). More particularly, as is relevant here, commercial truck drivers have a diminished expectation of privacy in the location of their vehicles because of their participation in a pervasively regulated industry.

However, as this Court explained in *People v Keta* , the heightened level of protection against unreasonable searches contained in New York's Constitution requires courts to examine whether the regulatory scheme authorizing the search is merely a pretext " 'to give the police an expedient means of enforcing penal sanctions' " (79 NY2d at 498). *Keta* involved the constitutionality of Vehicle and Traffic Law § 415–a (5) (a), which "authorize[d] the police to conduct random warrantless searches of vehicle dismantling businesses to determine whether such businesses [were] trafficking in stolen automobile parts" (*id*. at 492). Although the U.S. Supreme Court had held previously in *People v Burger* (482 US 691 [1987]) that the statute did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures, we concluded that the statute failed to meet the "exception to the warrant and probable cause requirements embodied in article I, § 12" of our State's Constitution (*Keta*, 79 NY2d at 499).

We reasoned as follows:

> "While a precise and all-encompassing definition of what
> constitutes a 'pervasive' regulatory scheme is not possible,
> such minimal regulatory requirements as the obligations to
> register with the government, to pay a fee and to maintain
> certain prescribed books and records are not, in themselves,

sufficient. Indeed, in modern society, many trades and businesses are subject to licensing, bookkeeping and other similar regulatory measures. If the existence of such relatively nonintrusive obligations were sufficient, few businesses would escape being labeled "closely regulated," and warrantless, suspicionless general inspections of commercial premises would become the rule rather than the exception" (*id*. at 499).

Unlike the regulatory scheme at issue in *Keta*, which instituted bookkeeping obligations for the pretextual purpose of uncovering "automobile theft" (79 NY2d at 500), the ELD rule is a refinement of this State's decades-long regulation of commercial vehicle drivers' hours of service. It is designed to respond to widespread and longstanding falsification of records and errors under the old system of using paper records to document hours of service. Consequently, the ELD rule is encompassed within the long tradition of pervasive governmental regulation of the commercial trucking industry whose purpose is to ensure the safety of motorists traveling on our public highways.

B.

Petitioners' counter that, even if CMV operators subject to the ELD rule are considered participants in a pervasively regulated industry, not every invasion of their diminished expectation of privacy is permissible. They are correct. The test for the constitutionality of a regulation does not end with a determination that participants in an industry have a lessened expectation of privacy because of that industry's history of pervasive regulation. We must also determine whether the ELD rule "guarantee[s] the 'certainty and regularity of . . . application' necessary to provide a 'constitutionally adequate substitute for a warrant' " (*Keta*, 79 NY2d at 499). Under this second requirement for an administrative search, the regulatory scheme governing the search must " 'provide

either a meaningful limitation on the otherwise unlimited discretion the [regulation] affords or a satisfactory means to minimize the risk of arbitrary and/or abusive enforcement' " by "ensur[ing] . . . that the search is limited in scope to that necessary to meet the interest that legitimized the search in the first place" (*Quackenbush*, 88 NY2d at 542).

The ELD rule meets this second requirement because the scope of the warrantless inspections authorized by the rule is limited to that necessary to further the regulatory scheme governing drivers' hours of service. Contrary to petitioners' contention, it is neither dispositive that (1) drivers can still falsify their records, because changes in duty status must be manually entered into the ELD, nor that (2) the location data recorded by the ELD is not directly used to calculate a driver's compliance with hours-of-service regulations.

Respondents readily admit that ELDs do not prevent all attempts to evade hours-of-service regulations. That is hardly surprising. Many, if not all, regulatory schemes are capable of manipulation by bad actors.

However, compared to paper records, ELDs are intended to significantly reduce drivers' opportunities to falsify their duty-status records and evade hours-of-service limitations, because ELDs automatically record the truck's location and engine hours (*see* NY Reg, Jan. 16, 2019 at 10). This feature of ELDs impedes cheating. For example, if a driver attempted to drive when the vehicle is not supposed to be in motion, the ELD would record the vehicle's movement (*see* 49 CFR 395.26 [d] [1]; *see* 80 Fed Reg 78292, 78367). Plus, if a driver claimed to be using the vehicle for authorized personal use while actually on duty, the location data collected by the ELD might reveal a pattern more akin to a

trucking route (49 CFR 395.26 [d] [2]; *see* 80 Fed Reg 78292, 78367). Consequently, although the ELD's GPS function is not used to calculate a driver's hours of service directly, it serves "as a cross check to verify that [the ELD] data has not been manipulated" (80 Fed Reg at 78328).

In addition, the limitations on the data recorded by ELDs and the scope of the search authorized by the rule meaningfully limit the discretion of the officials performing the search. ELDs record only limited data relating to the location and movement of the vehicle and the identity and duty status of the driver (*see* 49 CFR 395.24, 395.26). Inspecting officers can retrieve that data electronically without entering the vehicle (*see* 49 CFR part 395, subpart B, Appendix A, 4.10.1), and the ELD rule does not authorize them to search either the cab of the truck or the driver for contraband (*cf.* 49 CFR 395.24 [d]). Furthermore, "ELDs record only at specified times, such as when the vehicle is turned on, when the duty status changes, and once per hour when driving" (*Owner-Operator*, 840 F3d at 887; *see* 49 CFR 395.26).[3]

There is also no merit to petitioners' contention that the ELD rule is unconstitutional because it fails to limit the frequency of the authorized searches. In *Keta*, although we struck down searches of vehicle dismantling businesses, we observed that clear standards for what constitutes a violation and when searches are permissible could adequately substitute for a search warrant (*see* 79 NY2d at 499-500). Unlike the businesses in *Keta*,

---

[3] Contrary to petitioners' contention, ELDs do not engage in continuous tracking "24 hours a day, 365 days a year."

mobile commercial vehicles are operable at all hours of the day and hours-of-service violations can occur anywhere at any given time. Those factors are relevant to the appropriate time and frequency limitations of an administrative search (*cf. United States v Vasquez-Castillo*, 258 F3d 1207, 1212 [10th Cir 2001]).

Here, constraints on the frequency of roadside searches of ELD data are inherent in the broader scheme of CMV regulation. The ELD rule "makes no changes to the longstanding and current system of commercial motor vehicle enforcement," under which "[m]ost truck and/or driver inspections are performed roadside under the 'pervasively regulated industry' exception to the Fourth Amendment of the U.S. Constitution" (NY Reg, Jan. 16, 2019 at 10). In other words, there is a reasonable limitation on the frequency of searches under the ELD rule because a proper roadside inspection (*i.e.*, search) of ELD data requires, like other CMV enforcement, that the vehicle is stopped (*i.e.*, seized) constitutionally (*see People v Singleton*, 41 NY2d 402, 404 [1977] ["[A] motor vehicle on a public highway may be stopped only where the officer has specific cause or reasonable suspicion of a violation of law or in accordance with nonarbitrary, nondiscriminatory, uniform procedures, such as at roadblocks, checkpoints and weighing stations"], citing *Ingle*, 36 NY2d at 420).

## C.

The ELD rule does not authorize unconstitutional GPS tracking. Although this Court found certain warrantless GPS tracking to be unconstitutional in *People v Weaver* and *Matter of Cunningham v New York State Dept. of Labor* (21 NY3d 515 [2013]), those cases involved the surreptitious use of GPS devices. In *Weaver* the GPS device was

attached to the automobile of a criminal suspect and was used to track the suspect's movements (*see* 12 NY3d at 436-437). *Cunningham* involved the use of a GPS tracker installed covertly on a State employee's vehicle as part of an investigation by the Office of the State Inspector General into the employee's falsification of time records (*see* 21 NY3d at 518-519). In both cases we held that the GPS searches at issue were unconstitutional under article I, § 12 of the New York Constitution because they were unreasonably intrusive (*see id*. at 522-523; *Weaver*, 12 NY3d at 446-447).

This case is easily distinguishable from both *Weaver* and *Cunningham*. First, under the ELD rule, drivers and motor carriers are aware that the location of the vehicle is being intermittently recorded and of their duty to provide ELD data "[o]n request by an authorized safety official" as a condition of participation in the industry (49 CFR 395.24 [d]). That is materially different from the secret, surreptitious tracking in *Weaver* and *Cunningham*, where vehicle owners were not aware of the GPS device on their vehicles, they had no opportunity to adjust their expectations of privacy accordingly, and the GPS data was intended to ferret out crime rather than enforce a regulatory scheme aimed at public safety.

Additionally, although location data is recorded on an ELD whenever the vehicle is activated, it is not nearly as precise or frequent as the tracking in *Weaver* and *Cunningham*. In *Weaver*, the GPS tracking pinpointed a private vehicle's location to within 30 feet at all times, which potentially permitted inferences disclosing off duty activities that a person may want to keep private (*see* 12 NY3d at 436, 441-442). By contrast, the ELD rule limits the specificity necessary in the recording of the truck's location to within—at its most

precise—a half-mile radius when the driver is on duty (*see* 49 CFR part 395, subpart B, Appendix A, 4.3.1.6 [c]).  It also only records the vehicle's location once per hour and when the driver is on duty (*see* 49 CFR 395.26; 49 CFR part 395, subpart B, Appendix A, 4.6.1.7. [c]).  And unlike the continuous and precise off duty tracking in *Cunningham*, when a "driver indicates authorized personal use" of their vehicle, engine hours and vehicle miles are not recorded by the ELD (49 CFR 395.26 [d]) and the specificity of the GPS data is reduced to indicating the location of the truck to within an approximately ten-mile radius (49 CFR § 395.26 [d], [i]).  This is a relatively limited intrusion upon those receiving governmental approval to operate large, potentially dangerous, commercial vehicles on public roads for economic benefit.

### D.

Notably, although the U.S. Supreme Court's Fourth Amendment jurisprudence places "great weight on the fact that [a provision] is supported by a 'substantial' governmental interest and that warrantless inspections are 'necessary to further [the] regulatory scheme,' " our Court has held "[those] factors in themselves to be insufficient justification for departing from article I, § 12's general prohibition against warrantless, suspicionless searches" (*Keta*, 79 NY2d at 500).  As we explained in *Keta*, "[s]uch arguments are always available when the regulatory activity in question has a law enforcement-related goal" (*id*.).  For that reason, we require that there must be "real *administrative* violations that could be uncovered in a search" (*id*. at 500) and that the asserted regulatory scheme doesn't merely " 'authorize[ ] searches undertaken solely to uncover evidence of criminality' " (*id*. at 495).

Unlike the penalties at issue in *Keta*, the penalties here are tied to noncompliance with the regulatory scheme itself, the goal of which is highway safety and not merely the enforcement of criminal laws. Indeed, DOT's regulations provide that an administrative inspection of a commercial vehicle is limited "to ascertain[ing] whether the rules and regulations of the Commissioner [e.g., the hours-of-service rules] are being obeyed," meaning that the search authorized by the ELD rule does not operate as a mere pretext for warrantless discovery of criminal activity (17 NYCRR 820.12 [a]).

Indeed, there are numerous administrative sanctions for a driver's violation of hours-of-service requirements discovered by a search of their ELD (*see* 17 NYCRR 820.6 [adopting federal ELD rule's administrative requirements]). For example, authorized officials are empowered to place drivers out of service if they violate the hours-of-service requirements (*see* 49 CFR 395.13), and such violations can be discovered using ELD data. Violations are also punishable by civil sanctions, not just criminal ones, including traffic infractions and civil penalties up to $10,000 (*see* Transportation Law § 145 [3]; 17 NYCRR 820.10 [a]). Contrary to petitioners' contention, the fact that an inspection of ELD data may also reveal violations of the regulatory scheme that carry criminal penalties is insufficient, standing alone, to render the search unlawful (*see Quackenbush*, 88 NY2d at 538-545).

IV.

We therefore conclude that the courts below properly determined that the ELD rule is constitutional. However, Supreme Court should have declared the rights of the parties rather than dismissing the complaint (*see Garcia*, 31 NY3d at 621 n 4). Accordingly, the

order of the Appellate Division should be modified, with costs to respondents, by granting

judgment to respondents in accordance with this opinion and, as so modified, affirmed.


Order modified, with costs to respondents, by granting judgment to respondents in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Troutman. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro and Halligan concur.


Decided June 13, 2023