C.F. v New York City Dept. of Health & Mental Hygiene (2020 NY Slip Op 07867)





C.F. v New York City Dept. of Health & Mental Hygiene


2020 NY Slip Op 07867


Decided on December 23, 2020


Appellate Division, Second Department


Scheinkman, P.J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 23, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
MARK C. DILLON
HECTOR D. LASALLE
LINDA CHRISTOPHER, JJ.


2019-04455
 (Index No. 508356/19)

[*1]C.F., etc., et al., appellants, 
v
New York City Department of Health and Mental Hygiene, et al., respondents.



APPEAL by the plaintiffs/petitioners, in a hybrid action for declaratory and injunctive relief and proceeding pursuant to CPLR article 78, from an order and judgment (one paper) of the Supreme Court (Lawrence Knipel, J.), dated April 18, 2019, and entered in Kings County. The order and judgment denied the motion of the plaintiffs/petitioners for declaratory and injunctive relief and, in effect, denied the petition and dismissed the complaint and proceeding.



Law Office of Robert J. Krakow, P.C., New York, NY (Robert J. Krakow, Robert F. Kennedy, Jr., and Elan Gerstmann of counsel), for appellants.
James E. Johnson, Corporation Counsel, New York, NY (Jeremy W. Shweder and Daniel Matza-Brown of counsel), for respondents.



SCHEINKMAN, P.J.


OPINION & ORDER
On April 17, 2019, the Board of Health of the Department of Health and Mental Hygiene of the City of New York adopted a resolution stating that, due to the active outbreak of measles among people residing within certain areas of Brooklyn, any person over the age of six months who was living, working, or attending school or child care in the affected areas had to be immunized against measles, absent a medical exemption. Failure to comply was made punishable by fines authorized by law, rule, or regulation, for each day of noncompliance. The plaintiffs/petitioners (hereinafter the petitioners), residents of areas covered by the resolution, challenge its validity. We hold that the resolution was lawful and enforceable, reserving, however, whether any fine imposed upon violation is excessive. The resolution was within the authority of the Board of Health of the Department of Health and Mental Hygiene to make and the resolution itself did not violate any right of the petitioners, including their freedom of religion.
RELEVANT FACTS
Measles is a highly contagious viral disease that can result in serious health complications, including pneumonia and swelling of the brain, and may cause death. While measles can be serious in all age groups, children, pregnant women, and people with compromised immune systems are more likely to suffer from measles complications. Measles may cause both short-term and long-term complications.
Measles is easily transmitted from person to person and is one of the most contagious of all infectious diseases. Up to 90% of non-immunized persons who come into contact with a measles patient, or a space where a measles patient has recently been, will develop measles. The virus is transmitted by direct contact with infectious droplets or by airborne spread when an infected person breathes, coughs, or sneezes. The virus can live for up to two hours in air or on surfaces where an infected person coughed or sneezed. If a non-immunized person breathes contaminated air or touches an infected surface, and then touches his or her eyes, nose, or mouth, the person may [*2]become infected. A person can spread measles from four days before through four days after the appearance of a rash. Measles is so contagious that each new case of it severely hinders the ability of health officials to curb an outbreak, especially in communities with higher rates of unvaccinated, non-immune individuals. The Centers for Disease Control (hereinafter CDC) places importance on prompt recognition, reporting, and investigation of measles so that the spread of the disease can be limited with early case identification and public health response, including vaccination.
The Measles-Mumps-Rubella (hereinafter MMR) vaccine has proven to be effective in preventing the transmission of measles. Prior to the start of a measles vaccination program in 1963, an estimated three to four million people contracted measles each year in the United States. By 2000, measles transmission was declared eliminated in the United States, though there have been scattered outbreaks. People who have received the MMR vaccine do not infect others and are not responsible for measles transmission. The CDC recommends that children receive two doses of the MMR vaccine, the first dose at between 12 to 15 months of age and a second dose at between 4 to 6 years of age. New York has long required that school children be vaccinated against specified diseases as a condition of attendance at public school (see Public Health Law § 2164), a requirement long and repeatedly held to be constitutional (see Matter of Viemeister, 179 NY 235 [smallpox]; McCartney v Austin, 31 AD2d 370 [polio, smallpox, and measles]; Phillips v City of New York, 775 F3d 538 [2d Cir] [chicken pox]).
Despite the success of the long-standing vaccination program, measles outbreaks, defined as three or more cases, have been occurring in recent times. There were 17 outbreaks in 2018, most of which occurred in New York and New Jersey, mostly attributable to unvaccinated persons in Orthodox Jewish communities. According to the CDC, from January 1 to April 11, 2019, some 555 individual cases of measles were confirmed in 20 states, the second-largest number of cases reported in the United States since measles was eliminated in 2000.
An outbreak of measles began in the Williamsburg and Borough Park sections of Brooklyn in early October 2018. To address the situation, the Department of Health and Mental Hygiene of the City of New York (hereinafter the City Health Department or the Department) undertook significant outreach efforts in the affected communities, including meeting with community leaders, making thousands of robo-calls to households, sending letters to school principals and parents of students, communicating with local elected officials, embedding staff in medical centers within the community, and distributing additional doses of the MMR vaccine to community healthcare providers. These efforts resulted in more than 8,700 additional vaccinations in Williamsburg and Borough Park between October 1, 2018, and April 14, 2019, compared to the same time period the year prior.
The existence of the measles outbreak in New York City did not go unnoticed by the State Legislature. It acted by repealing the religious exemption from mandatory vaccination for school children. The legislative history reflects the legislative finding that outbreaks in New York had been the primary driver of the worst outbreak of measles in the United States since 1994, with 810 of the 880 nationwide cases in 2019 (see Doe v Zucker, 2020 WL 6196148, 2020 US Dist LEXIS 196279 [ND NY, No. 1:20-cv-840 (BKS/CFH)] [rejecting challenge to allegedly burdensome medical exemptions to mandatory school immunization requirements]). The elimination of the religious exemptions took effect on June 13, 2019 (see L 2019, ch 35, § 1, repealing Public Health Law § 2164[9]).
Notwithstanding efforts to control the outbreak, the incidence of measles continued to spread. As of April 15, 2019, 267 cases were reported in Williamsburg and 52 were reported in Borough Park. Twenty-five individuals were hospitalized, six in intensive care. Fifty-two chains of transmission, discrete outbreaks that comprised the larger outbreak in Brooklyn, were identified, including 32 that were still in the window of active transmission. All but 45 of the 329 confirmed cases involved minors: 56 cases involved children under 1 year of age; 162 cases involved children between 1 and 4 years of age; and 66 cases involved children between 5 and 18 years of age. While only a single confirmed case was reported in September 2018, and 13 in October 2018, there were 114 confirmed cases in March 2019. Sixty-two new cases were reported in the first 15 days of April 2019. Of the 44 new cases reported in the week ending April 15, 2019, 39 of them arose in Williamsburg; only 3 in Borough Park.
On April 9, 2019, in response to the measles outbreak, the Commissioner of the City Health Department issued orders declaring the existence of a public health emergency. The Commissioner mandated that any unvaccinated person older than six months of age who lived or worked within four specified zip codes in the Williamsburg neighborhood must be vaccinated unless such person could demonstrate to the satisfaction of the City Health Department either that the person already had immunity to the disease or should be treated as medically exempt. The [*3]Commissioner determined that the presence of any person in Williamsburg lacking the MMR vaccine (absent immunity or a medical exemption) created an unnecessary and avoidable risk of continuing the outbreak and was therefore a nuisance, as defined in the Administrative Code of the City of New York § 17-142. The orders warned that failure to comply "is a violation of § 3.05 of the New York City Health Code, and a misdemeanor for which you may be subject to civil and/or criminal fines, forfeitures and penalties, including imprisonment." The orders were to be in effect until the next meeting of the Board of Health of the City Health Department (hereinafter the Board or the Board of Health), scheduled for April 17, 2019, at which time it might be continued or rescinded by the Board.
The petitioners, on behalf of themselves and their children, commenced this hybrid action for a declaratory judgment and injunctive relief, and proceeding pursuant to CPLR article 78, seeking to vacate the Commissioner's orders, permanently enjoin their implementation, and declare them arbitrary, capricious, contrary to law, and beyond the Commissioner's authority. The petition alleged that there was insufficient evidence of a dangerous measles outbreak to justify the orders, the Commissioner failed to use the least restrictive means such as isolation and quarantine of infected individuals and ignored the risk of harm from the MMR vaccine, and there was no authority to declare a person a nuisance. Further, the petitioners alleged that the orders illegally overrode the children's religious exemption regarding school attendance under Public Health Law § 2164(9), and violated the petitioners' federal and state constitutional rights to free exercise of their religion, bodily autonomy and informed consent, and equal protection.
The petition was accompanied by affidavits of doctors opining against the orders, the vaccine insert, medical and governmental documents regarding the vaccine, and affidavits by the petitioners affirming that vaccination is against their deeply held religious beliefs [FN1]. By order to show cause, the petitioners sought, inter alia, to permanently enjoin implementation of the orders and have them declared ultra vires. The Supreme Court declined to temporarily enjoin the orders.
On April 17, 2019, the Board adopted a resolution in which it reported that since September 2018 there had been more than 300 cases of measles in the City of New York, with the vast majority occurring among people within the four specified zip codes in Williamsburg. The Board found that new cases of measles were still occurring at an alarming rate, that measles is a highly contagious viral disease that can result in serious health complications, including death, that the MMR vaccine is a safe and effective means of preventing measles transmission, and that a high rate of people living in the affected zip codes in Williamsburg had not been vaccinated. The Board determined that the efforts taken by the City Health Department, including orders excluding unvaccinated children from attending preschools and daycare programs, had not stopped the outbreak.
The Board declared that the outbreak of measles in Williamsburg threatened the health and safety of New Yorkers and was so "immediately dangerous to life and health" as to constitute a public nuisance. The Board found that the outbreak was occurring because a large number of people in the affected zip codes had not been vaccinated and concluded that the only way to end the outbreak was to require that people residing, working, or attending school in the affected areas be vaccinated against, or otherwise have immunity against measles. The Board ordered that any person who lived or worked within the affected zip codes must be vaccinated unless the person could demonstrate, to the satisfaction of the City Health Department, either immunity to the disease or entitlement to a medical exemption from the requirement. The Board also ordered that any parent of a child six months of age or older who lived or attended school, preschool, or child care within the affected zip codes (and who had not already been given the MMR vaccine) shall cause such child to be vaccinated against measles, absent immunity or medical exemption. The resolution stated that any person violating the order shall "be subject to the fines authorized by applicable law, rule and regulations each day" the violation continued until the outbreak was declared to be over.
The next day, April 18, 2019, was the return date of the order to show cause. At the appearance, counsel for the City handed up the Board's resolution, stated that the original orders of April 9, 2019, had expired, and noted that the Board's resolution limited sanctions for violators to civil fines. The petitioners agreed to deem the petition amended to address the Board's resolution [*4]as opposed to the expired orders. Counsel for the petitioners acknowledged, and did not object to, the Supreme Court's reiteration that the issue of criminal sanctions for noncompliance was "off the table."
In an order and judgment dated April 18, 2019, the Supreme Court denied the petitioners' motion for declaratory and injunctive relief and, in effect, denied the petition and dismissed the complaint and proceeding. The court, noting that the Board's resolution provided only for the imposition of fines for violations, dismissed, as moot, the petitioner's challenge to the portion of the April 9, 2019, orders which provided for the possible imposition of criminal penalties for violations.
The Supreme Court concluded that there existed an emergent measles epidemic in the affected zip codes sufficient to warrant the declaration of a public health emergency. The court rejected the petitioners' contention that the remedy imposed was arbitrary and capricious or otherwise unlawful on the basis that the Board failed to use the least restrictive means to control the outbreak. The court rejected the medical opinions offered by the petitioners as completely unsupported by studies or medical literature. As to religious objections, the court noted that the Public Health Law § 2164(9) exemption applied only to immunization required to admit a child to school, not to the remedies attendant upon declaration of a public health emergency. In any event, said the court, the petitioners' affidavits were insufficient to raise the issue because they were unsupported by an affidavit of a religious official or other doctrinal documentation. With respect to moral objections, the court stated that it need not address the issue of forcible vaccination because even the petitioners conceded that the resolution did not require forcible vaccination. Finally, the court reasoned that the issue of informed consent was improperly raised in this context, as a firefighter need not obtain the informed consent of the owner before extinguishing a fire, and vaccination is known to extinguish the fire of contagion.
The petitioners noticed an appeal. This Court denied the petitioners' motion to stay enforcement of the Board's resolution pending determination of the appeal. The City informs us that, by mid-July 2019, the number of new measles cases in New York City had dropped to zero and that in early September 2019, the Board rescinded the April 17, 2019 resolution. Despite the resolution no longer being in effect, the petitioners perfected their appeal on October 18, 2019.
LEGAL ANALYSIS
I. Mootness
The respondents contend that this appeal should be dismissed as academic because the Board rescinded the resolution in September 2019 when the outbreak ended. We agree that the rescinding of the resolution renders the appeal of the dismissal of this hybrid CPLR article 78 proceeding and action for declaratory and injunctive relief academic (see Matter of Blossom View Nursing Home v Novello, 4 NY3d 581, 584 n 1; Matter of Gorman v Town Bd. of Town of E. Hampton, 273 AD2d 235, 236). "It is a fundamental principle of our jurisprudence that the power of a court to declare the law only arises out of, and is limited to, determining the rights of persons which are actually controverted in a particular case pending before the tribunal" (Matter of Hearst Corp. v Clyne, 50 NY2d 707, 713). Courts are prohibited from rendering advisory opinions and "an appeal will be considered moot unless the rights of the parties will be directly affected by the determination of the appeal and the interest of the parties is an immediate consequence of the judgment" (id. at 714; see Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 810).
Nevertheless, there is an exception to the mootness doctrine, permitting judicial review, where the case presents a significant issue which is likely to recur and evade review (see Matter of State of New York v Robert F., 25 NY3d 448, 453 n 1; City of New York v Maul, 14 NY3d 499, 507; Wisholek v Douglas, 97 NY2d 740, 741; Matter of Hearst Corp. v Clyne, 50 NY2d at 714-715; Matter of In Defense of Animals v Vassar Coll., 121 AD3d 991, 992). The exception to the mootness doctrine requires the existence of three common factors: (1) a likelihood that the issue will repeat, either between the same parties or other members of the public; (2) an issue or phenomenon typically evading appellate review; and (3) a showing of significant or important questions not previously passed upon (see People ex rel. Rosario v Superintendent, Fishkill Corr. Facility, 180 AD3d 920, 921; People ex rel. Wells v DeMarco, 168 AD3d 31, 37-39; see also Coleman v Daines, 19 NY3d 1087, 1090).
Our analysis of the three factors leads us to conclude that the exception applies. First, it is likely that the central issue presented—whether the Board of Health may lawfully mandate vaccination of a given subset of the population in order to control the spread of a highly communicable disease—will recur, either between the respondents and the present petitioners or between the respondents and others. As we consider this case, we are very much aware of the COVID-19 pandemic which has caused so much death, severe illness, and economic dislocation in [*5]our State and nation. We are aware too of the public discourse on the development and approval of a vaccine and the concerns expressed as to the willingness of the public to accept the vaccine voluntarily. Second, where a public health crisis leads the public health authorities to mandate the administration of a vaccine, effective appellate review may be evaded where the crisis is abated within a short time. Third, the issues presented are significant and have not been dispositively addressed. While the Court of Appeals has acknowledged the significant power of the Board of Health to adopt regulations mandating influenza immunizations for infants and children attending certain preschools in order to proactively avoid the spread of an infectious disease (see Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d 601), the issue here is different and novel. We are asked to decide whether the Board of Health, as a means of controlling a contagion that has already spread, may mandate the vaccination of all persons who live or work, and children who attend school, within the affected area. Thus, we believe that the issues should be determined on their merits.
However, there is one aspect of the matter that we decline to address. Since the petitioners amended their petition to address the Board's April 17, 2019 resolution, in place and stead of their challenge to the Commissioner's April 9, 2019 orders, we have no occasion here to take up any issues with respect to the Commissioner's April 9, 2019 orders. We note that, although the petitioners contend in their appellate brief that the possibility of criminal penalties for violations was not actually eliminated, we do not consider this claim in view of their concession before the Supreme Court that the issue of criminal sanctions for violations of the Board's April 17, 2019 resolution was "off the table."
II. The Finality of the Determination
The petitioners suggest that the Supreme Court erred in dismissing the hybrid action and proceeding because their order to show cause sought only preliminary injunctive relief. Implicit in this argument is the contention that, upon disagreeing with the petitioners' assertions, the court should have restricted its determination to the denial of preliminary injunctive relief and should have allowed the case to continue on for further adjudication. We disagree.
In their order to show cause and supporting papers, the petitioners sought, in addition to preliminary injunctive relief, a permanent injunction enjoining implementation of the Commissioner's orders and a declaration that they are invalid. The petitioners thus requested all of the relief they sought in their petition. The parties briefed all of the issues and laid bare their proof. "[U]nless public policy is violated, parties to a litigation are free to chart their own procedural course" (Kass v Kass, 91 NY2d 554, 568 n 5; see Islip Theaters, LLC v Landmark Plaza Props. Corp., 183 AD3d 877, 878).
Although the petitioners' counsel, at oral argument before the Supreme Court, stated that the request for permanent injunctive relief was a "typographical mistake," the fact is that such requests were repeated throughout the petitioners' papers. Moreover, the petitioners never disclaimed their request for final declaratory relief. Even their appellate brief continues to seek vacatur of the resolution and a declaration in their favor.
In a hybrid proceeding and action, "where no party makes a request for a summary determination of the causes of action which seek to recover damages or declaratory relief, it is error for the Supreme Court to summarily dispose of those causes of action" (Matter of Rosenberg v New York State Off. of Parks, Recreation, & Historic Preserv., 94 AD3d 1006, 1008; see Matter of Bonacker Prop., LLC v Village of E. Hampton Bd. of Trustees, 168 AD3d 928, 932).
Here, however, the petitioners did make a dispositive motion seeking a declaration. In part, the motion was, in effect, for summary judgment declaring the resolution invalid (see e.g. Matter of Red Wing Props., Inc. v Town of Rhinebeck, 184 AD3d 577, 578). Generally, a summary judgment motion is premature prior to the service of an answer (see Ferrera v City of New York, 164 AD3d 754, 756). However, a court may treat a pre-answer motion as one for summary judgment if it "give[s] prior notice to the parties or, through their submissions, the parties themselves . . . demonstrate an intent to deliberately chart a summary judgment course" by laying bare their proof (Elhannon, LLC v Brenda J. DeLuca Trust, 108 AD3d 911, 911-912 [brackets and internal quotation marks omitted]; see CPLR 3211[c]; Matter of Dashnaw v Town of Peru, 111 AD3d 1222, 1224).
We agree with the Supreme Court that, under the circumstances presented, it was appropriate to determine the ultimate merits of this case. However, upon deciding those merits in favor of the respondents, the court should not have dismissed the declaratory judgment cause of action. Rather, the court should have directed the entry of judgment with the appropriate declaration (see Lanza v Wagner, 11 NY2d 317, 334). Therefore, upon our consideration of the merits, we will make an appropriate declaration (see Curanovic v Cordone, 134 AD3d 978, 980-981).
III. The Resolution Was Within the Board's Authority to Make
In approaching our consideration of the petitioners' challenge to the Board's action, we begin by noting that judicial review of an agency's determination is limited to whether the "determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed" (CPLR 7803[3]; see Matter of Save America's Clocks, Inc. v City of New York, 33 NY3d 198, 207).
The petitioners contend that the resolution of April 17, 2019, was made in excess of the Board's authority. According to the petitioners, the Board acted outside of its police powers with respect to public health by labeling non-vaccinated persons a "nuisance" that must be abated and using the theory of public nuisance to override the long-standing preference in New York against mandatory adult immunization. We disagree.
The New York City Charter empowers the City Health Department with "jurisdiction to regulate all matters affecting health in the city of New York" (NY City Charter § 556), including matters relating to "communicable and chronic diseases and conditions hazardous to life and health" (id. § 556[c][2]). Administrative Code of the City of New York § 17-109 delegates to the Department— and, by extension, the Board (see NY City Charter § 558[c])—the authority to "take measures . . . for general and gratuitous vaccination" (Administrative Code of City of NY § 17-109[b]). The Board therefore has the "authority to adopt vaccination measures" (Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d at 611). In Garcia, the Court of Appeals upheld the Board's rule mandating influenza vaccines for children attending city-regulated child care or school-based programs (see id. at 613-614). In reviewing the long history of the Board issuing mandates for various vaccinations, the Court stated that there was a "very direct connection between the flu vaccine rules and the preservation of health and safety" (id. at 612):
"To be sure, the flu vaccine rules necessarily impinge upon personal choice to some degree. This will almost always be true with health-related regulations. Notably, however, . . . the rules challenged here do not relate merely to a personal choice about an individual's own health but, rather, seek to ensure increased public safety and health for the citizenry by reducing the prevalence and spread of a contagious infectious disease within a particularly vulnerable population" (id.).
The petitioners concede that "health officials have historically had recourse to mandatory vaccination among its options." They object, however, to the "criminalization of their status." They note that violations of the health code, and the willful failure to abate a nuisance, both constitute misdemeanors (see NY City Charter § 558[e]; Administrative Code of City of NY § 17-143; Public Health Law § 12-b). Civil fines of up to $2,000 may be imposed each day one refuses to abate a nuisance, with the penalty increasing to up to $10,000 if the violation directly results in serious physical harm to any person (see NY City Health Code [24 RCNY, tit 1, art 3] §§ 3.09, 3.11[a],[e]). However, as previously discussed, the references to criminal penalties in the Commissioner's original orders were not present in the Board's resolution and the petitioners acquiesced in, and did not object to, the conclusion of the Supreme Court that the issue of criminal penalties was "off the table."
Contrary to the petitioners' assertion, the Board did not declare unvaccinated people to be a public nuisance. The Board's finding of a public nuisance was focused on the outbreak being a public nuisance, as distinguished from the persons within the affected area, vaccinated or not, contagious or not, being a public nuisance. As the resolution states, "an outbreak of measles is ongoing in the neighborhood of Williamsburg and . . . the outbreak poses a public nuisance because it is immediately dangerous to life and health." The resolution declares that the outbreak poses a public nuisance, not that unvaccinated people are themselves a nuisance.
The Board has the authority to declare a public nuisance, which includes "whatever is dangerous to human life or detrimental to health" (Administrative Code of City of NY § 17-142), and to order its abatement (see Administrative Code of City of NY § 17-145). A public nuisance is conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons (see 532 Madison Ave. Gourmet Foods v Finlandia Ctr., 96 NY2d 280, 292; Copart Indus. v Consolidated Edison of N.Y., 41 NY2d 564, 568). Conduct that causes the spread of contagious disease may constitute a public nuisance where it violates the public's right to health and safety (see Palmer v Amazon.com, Inc., 2020 WL 6388599, *7, 2020 US Dist LEXIS 203683, *20 [ED NY, No. [*6]20-cv-2468 (BMC)]). "[T]he threat of communication of [an infectious disease] to a single person may be enough to constitute a public nuisance because of the possibility of an epidemic" (Restatement [Second] of Torts § 821B, Comment g). A public nuisance is a violation against the State and is subject to abatement or prosecution by the proper governmental authority (see 532 Madison Ave. Gourmet Foods v Finlandia Ctr, 96 NY2d at 292). The Board unquestionably has the power to declare the outbreak of a contagious disease to be a public nuisance and to take steps, including imposition of vaccination requirements, to abate that nuisance.
The petitioners take issue with the means adopted by the Board to abate the outbreak—the imposition of a mandatory vaccination requirement. They contend that the Board used nuisance law to subvert the "consensus preference" against mandatory vaccination of adults. They note that mandates for vaccinations have historically been legislatively, rather than administratively adopted and, further, vaccination mandates have historically been limited to children. The petitioners cite Public Health Law § 613(1)(c), which states that "[n]othing in this subdivision shall authorize mandatory immunization of adults or children, except as provided in [Public Health Law §§ 2164 and 2165, mandating vaccination of children]" (see also Public Health Law § 206[1][l]).
In Garcia, the Court of Appeals determined that these statutory provisions did not limit the Board's separate and independent authority to mandate influenza vaccines of children. The statutory provisions are directed to the powers and duties of the Commissioner of the State Department of Health, not of the New York City Board, and the legislative history "reveals no intent to restrict the Board's authority to regulate vaccinations" (Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d at 620). "Indeed, by their plain language, these provisions simply make clear that the particular statutory subdivisions at issue do not authorize [the State Department of Health] to adopt additional mandatory immunizations, but nothing therein prohibits the adoption of mandatory immunizations if otherwise authorized by law" (id.).
The Board's invocation of its authority to abate public nuisances was not an invidious attempt to subvert the law regarding vaccinations. Rather, the Board's action was consistent with its independent and express authority to adopt vaccination measures (see Administrative Code of City of NY § 17-109; Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d at 611). Moreover, we see a significant distinction between statutory vaccination mandates that seek to generally interdict the occurrence of a communicable disease by the imposition of a permanent requirement that children be vaccinated, regardless of whether an outbreak has occurred, and a temporary, emergency regulation which generally requires that all persons situated in an area where a contagion has been unleashed be vaccinated in order to abate the contagion.
We cannot say that the Board's resolution exceeded the "limits of necessity" (Matter of Belle Harbor Realty Corp. v Kerr, 35 NY2d 507, 511 [internal quotation marks omitted]). The record before us reflects that the City Health Department, when it first realized in September 2018 that a measles outbreak was in offing, made considerable efforts to protect the public health through its outreach to the affected community and its distribution of information encouraging voluntary immunization. However, as the outbreak advanced into the spring, and the number of cases significantly increased despite the Department's outreach efforts, the imposition of a temporary mandatory immunization requirement in the affected area was a response to a dire necessity, reasonably calculated to alleviate the crisis condition (see id. at 512).
The Department took numerous steps to stem the outbreak prior to mandating vaccinations, including extensive outreach to the public and medical providers and the exclusion of unvaccinated children from schools and child care centers, regardless of religious exemption . While the Board was not required to use the least restrictive means to stem the outbreak, the prior, unsuccessful, measures support the reasonableness of the Board's action.
The petitioners proffer isolation and quarantine of infected individuals as preferable, at least to them, to vaccination. However, isolation and quarantine may be considered by many to be more restrictive to people's liberty than vaccination. Moreover, the Department has explained that measles is one of the most contagious of all infectious diseases, such that up to 90% of non-immune persons who come into contact with a measles patient, or a space where a measles patient recently has been, will develop measles. The virus is transmitted by droplets and airborne spread, and can live for up to two hours in air or on surfaces. Most significantly, a person can spread measles for four days before the appearance of a rash. As has become commonly accepted during our present health crisis, asymptomatic transmission limits the effectiveness of isolation of symptomatic individuals as a public health strategy. In any event, the Board is entitled to a high degree of deference in choosing between reasonable alternatives within its area of expertise (see Matter of Ralex Servs., Inc. v Shah, 145 AD3d 1013, 1014).
The petitioners also assert that the Board's action had the effect of overriding the religious exemption granted by Public Health Law § 2164(9). Any period of conflict was brief, since the Board's resolution was adopted on April 17, 2019, and the religious exemption was repealed effective June 13, 2019 (see L 2019, ch 35, § 1). And, in any event, the existence of the statute, and its then extant religious exemption, did not preempt the Board's independent authority to adopt vaccination measures (see Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d at 620-621 [State did not preempt the field of mandatory school vaccinations so as to invalidate the Board's flu vaccine rules]; see also 10 NYCRR 66-1.10 [authorizing the City Health Department's Commissioner to exclude students exempted from vaccination from schools in the event of an outbreak]).
IV. The Board Did Not Act Arbitrarily or Capriciously and Did Not Abuse its Discretion
The petitioners contend that the Board's declaration of a public nuisance and its adoption of a mandatory vaccination requirement was irrational, arbitrary, capricious, and an abuse of discretion. We do not agree.
"Administrative action is arbitrary when it is without a sound basis in reason and is taken without regard to the facts" (Wander v St. John's Univ., 147 AD3d 1009, 1010; see Matter of Pell v Board of Educ. of Union Free School Dist No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231). The court's review "is deferential for it is not the role of the courts to weigh the desirability of any action or choose among alternatives" (Matter of Save America's Clocks, Inc. v City of New York, 33 NY3d at 207 [internal quotation marks omitted]). Public health agencies, in particular, are entitled to a high degree of judicial deference when acting in the area of their particular expertise (see Matter of Ralex Servs., Inc. v Shah, 145 AD3d at 1014). The Board's declaration of a public health emergency was supported by its findings as to the harms caused by measles and the severity of the Williamsburg outbreak. Mandating vaccinations in the affected zip codes was a reasonable response to the outbreak.
The petitioners rely on affidavits of doctors opining that the risks of the MMR vaccine outweigh the risks of contracting measles and that vaccinated people are likely a greater threat to public health than unvaccinated people because recently vaccinated people shed the virus. However, in opposition to the petitioners' assertions, the City Health Department's Deputy Commissioner of the Division of Disease Control countered that the petitioners' medical affidavits made many false statements about measles and the MMR vaccine which are not supported in the generally acceptable medical literature and come from persons on the fringes of the medical community. The Deputy Commissioner asserted that the medical consensus is that the MMR vaccine is safe and effective.
An agency's decision to rely on the conclusions of its experts, rather than the conflicting conclusions of challengers' experts, does not render its determination arbitrary, capricious, or lacking in a rational basis (see Matter of 278, LLC v Zoning Bd. of Appeals of the Town of E. Hampton, 159 AD3d 891, 894). Here, it was eminently reasonable for the Board to rely on the medical consensus.
In this regard, we draw upon the wisdom of the Court of Appeals, expressed 116 years ago, in enforcing a requirement that, to attend a public school, a child needed to be vaccinated against smallpox (see Matter of Viemeister, 179 NY 235). In presenting the case, the Court stated that, while vaccination may strongly tend to prevent smallpox, the appellant disagreed, asserting that vaccination does not tend to prevent smallpox and tends to bring about other diseases, such that vaccination does much harm, with no good (see id. at 239). The Court held that the appellant's objection was without merit, stating:
"It must be conceded that some laymen, both learned and unlearned, and some physicians of great skill and repute, do not believe that vaccination is a preventive of smallpox. The common belief, however, is that it has a decided tendency to prevent the spread of this fearful disease and to render it less dangerous to those who contract it. While not accepted by all, it is accepted by the mass of the people as well as by most members of the medical profession. It has been general in our state and in most civilized nations for generations. It is generally accepted in theory and generally applied in practice, both by the voluntary action of the people and in obedience to the command of law.
* * *
"The fact that the belief is not universal is not controlling, for there is scarcely any belief that is accepted by every one. The possibility that the belief may be wrong and that science may yet show it to be wrong is not conclusive, for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases. In a free country where the government is by the people through their chosen representatives, practical legislation admits of no other standard of action, for what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not. Any other basis would conflict with the spirit of the Constitution and would sanction measures opposed to a republican form of government" (id. at 239-241).
Here, too, we can take note that there is a generally accepted belief, grounded in science, that the MMR vaccine is an effective and safe methodology to prevent the spread of measles. That success is shown by the near eradication of the disease in the United States from the inception of the vaccination in 1963 to the declaration of elimination in 2000. The importance of measles vaccination has been reflected in a legislative mandate that children be vaccinated as a precondition to attending school, a policy recently reinforced through the elimination of the religious exemption from the requirement (see Public Health Law § 2164). While some do not agree, and that is their right, the implementation of a vaccine mandate in order to control a measles outbreak is "a reasonable and proper exercise of the police power," adopted, not only to protect those required to be vaccinated but for the protection of all of the people of the City and State of New York (Matter of Viemeister, 179 NY at 241).
V. The Board's Action Did Not Violate the Petitioners' Constitutional Rights to Liberty
and Free Exercise of Religion
The United States Supreme Court long ago held that a State may mandate vaccinations without violating the liberty secured by the Fourteenth Amendment of the United States Constitution (see Jacobson v Massachusetts, 197 US 11). "According to settled principles, the police power of a [S]tate must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety" (id. at 25). "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members" (id. at 27). As the Court expressed:
"[T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others" (id. at 26).
The continued vitality of Jacobson was recently confirmed by Chief Justice Roberts in his concurring opinion in South Bay United Pentecostal Church v Newsom (__ US __, __, 140 S Ct 1613), in which he stated:
"Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.' Jacobson v Massachusetts, 197 US 11, 38 (1905). When those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.' Marshall v United States, 414 US 417, 427 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the [*7]background, competence, and expertise to assess public health and is not accountable to the people. See Garcia v San Antonio Metropolitan Transit Authority, 469 US 528, 545 (1985)" (South Bay United Pentecostal Church v Newsom, __ US __, __, 140 S Ct at 1613-1614 [Roberts, Ch. J., concurring][citations truncated]).
We note that, in a recent concurrence, Justice Neil Gorsuch pointed out that Mr. Jacobson was asserting, not his freedom of religion, but a right to bodily integrity under the Fourteenth Amendment. But, significantly, he also postulated that the governmental restriction in Jacobson, which provided that individuals could accept the vaccine, pay the fine, or assert a basis for exemption, "easily survived rational basis review, and might even have survived strict scrutiny, given the opt-outs available to certain objectors" (Roman Catholic Diocese of Brooklyn v Cuomo, 2020 WL 6948354, *6, 2020 US LEXIS 5708, *15 [Nov. 25, 2020, No. 20A87] [Gorsuch, J., concurring]). While he was joined in these views by Justice Kavanaugh, Justice Gorsuch's positions did not command a majority and, even these views do not foretell an abandonment of the Jacobson standard.
The petitioners contend that the Board's resolution violates their federal and state constitutional rights to the free exercise of religion (see US Const Amends I, XIV; NY Const, art 1, § 3). They argue that strict scrutiny applies and the Board failed to use the least restrictive means to control the outbreak. We disagree. Strict scrutiny does not apply to this neutral law of general applicability and, even if it did, the adoption of a geographically limited and temporary emergency mandatory vaccination requirement was supported by a compelling state interest and was narrowly tailored to apply only to a specific, confined geographical area with a high incidence of disease and only applied for a limited period of time.
The petitioners profess to hold religious beliefs that hold that a healthy body should not assimilate foreign objects, including vaccine ingredients [FN2]. In the order and judgment on appeal, the Supreme Court held that the petitioners' assertions of religious objection were insufficient, reasoning that the petitioners did not document their beliefs through the submission of an affidavit from a religious official or written doctrinal support. On appeal, the petitioners assert that the court erred in ruling their affidavits insufficient; the respondents do not dispute the sufficiency of the affidavits to raise the religious issue.
We see no reason not to credit the petitioners' assertions that they hold genuine religious beliefs which counsel against immunization. The absence of a supporting affidavit from a religious official and doctrinal textual documentation does not, by itself, render the petitioners' claims insincere or insubstantial. To at least some degree, the petitioners have explained the reasoning underlying their beliefs and we do not see, under the circumstances here, a legitimate basis for requiring the petitioners to further justify their viewpoints. The petitioners have the right to hold religious views and we have no basis here to press them to document the basis for their views.
The United States Supreme Court has "reject[ed] the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization" (Frazee v Illinois Dept. of Employment Security, 489 US 829, 834). "[T]he Free Exercise Clause does not demand adherence to a tenet or dogma of an established religious sect" (id. at 834; see F.F. v State of New York, 65 Misc 3d 616, 632 [Sup Ct, Albany County]; Ford v McGinnis, 352 F3d 582, 589 [2d Cir]).
In First Amendment jurisprudence, as articulated by the United States Supreme Court, laws specifically targeting religious conduct are subject to strict scrutiny; they "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest" (Church of Lukumi Babalu Aye, Inc. v Hialeah, 508 US 520, 531-532). However, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice" (id. at 531; see Employment Div., Dept. of Human Resources of Ore. v Smith, 494 US 872 [holding that a State may deny unemployment benefits to a person fired for violating a State prohibition on the use of peyote, even though the use of the drug was part of a religious ritual]). Our Court of Appeals has also rejected the application of strict scrutiny to neutral and generally applicable laws under the New York Constitution (see Catholic Charities of Diocese of Albany v Serio, 7 NY3d 510, 525-526).
While there are recent decisions of the United States Supreme Court which have reflected a greater solicitude to claims for religious exemptions from neutral, generally applicable [*8]laws than had previously been articulated (see e.g. Little Sisters of the Poor Saints Peter & Paul Home v Pennsylvania, __ US __, 140 S Ct 2367; Burwell v Hobby Lobby Stores, Inc., 573 US 682), those cases were not decided under the First Amendment, but under the federal Religious Freedom Restoration Act of 1993 (42 USC § 2000bb et seq. [hereinafter RFRA]).
RFRA was enacted in response to Employment Div., Dept. of Human Resources of Ore. v Smith (494 US 872), "in order to provide greater protection for religious exercise than is available under the First Amendment" (Holt v Hobbs, 574 US 352, 357). The requirement that a law be the "least restrictive means" of furthering a compelling governmental interest comes from RFRA (42 USC 2000bb-1[b][2]). The requirement goes further than strict scrutiny, which requires only that the law be narrowly tailored (see Burwell v Hobby Lobby Stores, Inc., 573 US at 695 n 3; City of Boerne v Flores, 521 US 507, 535; Ward v Rock Against Racism, 491 US 781, 798-799 [distinguishing narrowly tailored from least restrictive means]).
RFRA was held to be unconstitutional as applied to the States (see City of Boerne v Flores, 521 US at 532-536), and, in 2000, the statute was amended to delete all references to state and local governments (see 106 PL 274, 114 Stat 803, § 7). Although a number of States responded by enacting their own state-level RFRAs, New York has not done so (see e.g. 2011-2012 NY Senate Bill S00883; 2009 Senate Bill S06869; 2007 NY Senate-Assembly Bill S06464, A09098; 2005 Assembly Bill A10870). Thus, in the absence of an applicable RFRA, the Smith rule against strict scrutiny of neutral, generally applicable laws applies (see Masterpiece Cakeshop, Ltd. v Colorado Civil Rights Com'n, __ US __, __, 138 S Ct 1719, 1731-1732 [reviewing claim under neutrality principle]).
The petitioners rely on language from Justice Gorsuch's concurrence in Masterpiece Cakeshop, joined by Justice Alito, which characterized the Smith rule as "controversial in many quarters" (id. at 1734 [Gorsuch, J., concurring]). Indeed, a majority, or near majority, of United States Supreme Court Justices have either indicated disagreement with the principles articulated in Smith or have invited challenges to those principles (see e.g. Davis v Ermold, 2020 WL 5881537, *1, 2020 US LEXIS 3709, *3-4 [Thomas, J., concurring in denial of certiorari, joined by Alito, J.] [describing Court's "ungenerous interpretation of the Free Exercise Clause"]; Kennedy v Bremerton Sch. Dist., __ US __, __, 139 S Ct 634, 637 [Alito, J., concurring with denial of certiorari, joined by Thomas, J., Gorsuch, J. and Kavanaugh, J.] [noting case did not ask Court to revisit Smith's "drastic[ ] cut back on the protection provided by the Free Exercise Clause"]; Stormans, Inc. v Wiesman, __ US __, __, 136 S Ct 2433, 2433 [Alito, J., dissenting to denial of certiorari, joined by Roberts, Ch. J. and Thomas, J.] [in response to 9th Circuit opinion applying Smith rule: "If this is a sign of how religious liberty claims will be treated in the years ahead, those who value religious freedom have cause for great concern"]). While it is certainly conceivable that the United States Supreme Court may, in some future case, reconsider the standard for addressing a religious objector's challenge to neutrally applicable laws, we are bound to apply the constitutional principles as they now exist, rather than engage in a projection as to what principles may evolve in the future.
The United States Supreme Court has recently held that COVID-19 regulations will
likely not stand where they single out houses of worship for especially harsh treatment (see Roman Catholic Diocese of Brooklyn v Cuomo, 2020 WL 6948354, 2020 US LEXIS 5708 [Nov. 25, 2020, No. 20A87]). In so holding, the Court found that the challenged regulations were not "neutral" and of "general applicability," and therefore had to satisfy strict scrutiny by being both necessary to serve a compelling state interest and narrowly tailored (2020 WL 6948354, *2, 2020 US LEXIS 5708, *3, *5 [internal quotation marks omitted]). The Court did not, however, alter the standard by which neutral regulations of general applicability are measured. And, in viewing the challenged regulations as singling out houses of worship for adverse treatment, the Court noted that, in "red zone[s]," a church or synagogue could not admit more than 10 persons, while "essential" businesses could admit as many as they wished, with essential business including such enterprises as acupuncture facilities, camp grounds, and garages (2020 WL 6948354, *2, 2020 US LEXIS 5708, *3 [internal quotation marks omitted]). As explained by Justice Kavanaugh in his concurrence, because the State created a favored class of businesses, it had to justify why houses of worship were excluded from that favored class (2020 WL 6948354, *8, 2020 US LEXIS 5708, *22 [Kavanaugh, J., concurring]).
We believe that the Free Exercise Clause does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability, even if the law has the incidental effect of burdening a particular religious practice.
The petitioners contend that, nonetheless, strict scrutiny should still apply because they present a hybrid claim based on religious and parental rights. This argument relies on a statement in Smith that "[t]he only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not [*9]the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as . . . the rights of parents . . . to direct the education of their children" (Employment Div., Dept. of Human Resources of Oregon v Smith, 494 US at 881 [citations omitted]).
This hybrid rights theory has engendered much confusion and disagreement as to its contours and even as to its existence (see Parents for Privacy v Barr, 949 F3d 1210, 1236-1237 [9th Cir]; Combs v Homer-Center Sch. Dist., 540 F3d 231, 244-247 [3d Cir]; Parker v Hurley, 514 F3d 87, 97-99 [1st Cir]). The Second, Third, and Sixth Circuits have concluded that the hybrid rights language in Smith is dicta and apply Smith's rational basis standard to hybrid rights claims (see Combs v Homer-Center Sch. Dist., 540 F3d at 247; Leebaert v Harrington, 332 F3d 134, 143 [2d Cir]; Watchtower Bible & Tract Socy. of N.Y., Inc. v Village of Stratton, Ohio, 240 F3d 553, 561-562 [6th Cir], revd on other grounds 536 US 150; Kissinger v Board of Trustees of Ohio State Univ., Coll. of Veterinary Medicine, 5 F3d 177, 180 [6th Cir]). The Sixth Circuit views the hybrid rights exception as "completely illogical" (Kissinger v Board of Trustees of Ohio State Univ., Coll. of Veterinary Medicine, 5 F3d at 180), and the Second Circuit "can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated" (Leebaert v Harrington, 332 F3d at 144). The D.C. Circuit has also rejected the use of heightened scrutiny for hybrid rights claims (see Henderson v Kennedy, 253 F3d 12, 19 [DC Cir]).
The First Circuit has suggested that a free exercise claim must be conjoined with an independently viable companion claim to be subject to heightened scrutiny (see Gary S. v Manchester Sch. Dist., 374 F3d 15, 18-19 [1st Cir]). The Ninth and Tenth Circuits require a plaintiff to raise a "colorable claim" that a companion right has been violated, defined as "a fair probability or a likelihood, but not a certitude, of success on the merits" (San Jose Christian Coll. v Morgan Hill, 360 F3d 1024, 1032 [9th Cir]; see also Axson-Flynn v Johnson, 356 F3d 1277, 1297 [10th Cir]). However, even under this formulation, a plaintiff cannot "simply invoke the parental rights doctrine, combine it with a claimed free-exercise right, and thereby force the government to demonstrate the presence of a compelling state interest" (Swanson By & Through Swanson v Guthrie Ind. Sch. Dist. No. I-L, 135 F3d 694, 700 [10th Cir]). "[A]lleging multiple failing constitutional claims that do not have a likelihood of success on the merits cannot be enough to invoke a hybrid rights exception and require strict scrutiny" (Parents for Privacy v Barr, 949 F3d at 1237). Thus, even if a hybrid rights exception to Smith exists, the Board's resolution is not subject to strict scrutiny merely because the petitioners invoke their right to direct the upbringing of their children (see generally Troxel v Granville, 530 US 57, 65-66).
The petitioners do not advance a colorable claim that the Board's resolution violated their parental rights. Although "parents' liberty interest in the custody, care, and nurture of their children resides 'first' in the parents, [it] does not reside there exclusively, nor is it 'beyond regulation [by the state] in the public interest'" (Fields v Palmdale Sch. Dist., 427 F3d 1197, 1204 [9th Cir], quoting Prince v Massachusetts, 321 US 158, 166; see Parents for Privacy v Barr, 949 F3d at 1231). "Thus, [a parent] cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds" (Prince v Massachusetts, 321 US at 166; see Phillips v City of New York, 775 F3d at 543).
Accordingly, the appropriate standard of review for the petitioners' free exercise challenge is the rational basis test, not strict scrutiny. The Board's resolution does not target religion or single out religion; it does not even mention religion. There is absolutely no indication that the resolution was adopted for the purpose of infringing the petitioners' religious practices or suppressing their religious views (see Parents for Privacy v Barr, 949 F3d at 1235). The resolution treats all persons equally, whether religious or not (see id. at 1236). The resolution does not create any favored classes at all, much less ones that are secular rather than religious. As the resolution is religiously neutral and generally applicable, it is not subject to strict scrutiny.
The Board surely had a rational basis to mandate vaccination for virtually all persons residing, working, or going to school within zip codes with a measles outbreak. The petitioners' religious beliefs do not excuse them from compliance with an otherwise valid legal obligation of general applicability (see Employment Div., Dept. of Human Resources of Oregon v Smith, 494 US at 879-880).
Even if strict scrutiny applied, the Board's resolution is nonetheless valid as there is a plain and compelling interest in controlling a measles outbreak, and the resolution was narrowly tailored to advance that interest, as shown by the geographic limitation to an area in which the contagion was widespread, the Board's prior, unsuccessful efforts to stem the outbreak, and the temporal limitation of the resolution to the duration of the outbreak. Individuals within the affected [*10]area could accept the vaccine, pay a fine, seek a medical exemption, or temporarily relocate out of the narrowly drawn impacted area.
VI. The Petitioners' Challenge to Potential Fines is Premature
The Board's resolution provided that violations would be punishable each day by fines authorized by applicable law, rule, or regulation. While during the proceedings in the Supreme Court the City Health Department represented that enforcement of the Commissioner's orders would be limited to $1,000 civil fines, the Department has made no similar representation as to the amount of any fines to be sought for violation of the Board's resolution. Neither the petitioners nor the Department have cited, let alone discussed, the laws, rules, or regulations that the Department would rely upon to enforce the Board's mandate.
The petitioners argue that the use of a $1,000 fine, which was the represented sanction for violation of the Commissioner's orders, is an abuse of discretion pursuant to CPLR 7803(3) and is excessive under both the Federal (US Const Eighth Amend) and State (NY Const, art 1, § 5) Constitutions. However, the Department has not represented that it would seek a $1,000 fine, or a greater or lesser one, in any or all cases. We agree with the Department that, with a record so bereft of the key facts, whether some hypothetical amount might be an abuse of discretion or unconstitutionally excessive is not properly before us (see Matter of Street Vendor Project v City of New York, 43 AD3d 345, 346). In the event that fines are imposed upon any person for violation of
the Board's resolution, such person is free to argue in an appropriate proceeding that the fine is so disproportionate that it is an abuse of discretion, as well as to argue that the fine is so grossly disproportionate to the gravity of the offense as to be constitutionally excessive (see id. at 346).
VII. Conclusion
For these reasons, we agree with the Supreme Court that the April 17, 2019 resolution was a valid and constitutional exercise of the Board's authority. Since this is, in part, a declaratory judgment action, we modify the order and judgment by adding a provision thereto declaring that the April 17, 2019 resolution was a valid and constitutional exercise of the Board's authority (see Lanza v Wagner, 11 NY2d at 334).
Accordingly, the order and judgment is modified, on the law, by deleting the provision thereof dismissing the declaratory judgment cause of action, and adding a provision thereto declaring that the April 17, 2019 resolution of the Board was a valid and constitutional exercise of its authority; as so modified, the order and judgment is affirmed.
DILLON, LASALLE and CHRISTOPHER, JJ., concur.
ORDERED that the order and judgment is modified, on the law, by deleting the provision thereof dismissing the declaratory judgment cause of action, and adding a provision thereto declaring that the April 17, 2019 resolution of the Board of Health of the Department of Health and Mental Hygiene of the City of New York was a valid and constitutional exercise of its authority; as so modified, the order and judgment is affirmed, with costs to the respondents.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1: The affidavits identify the adult petitioners solely by their initials; their actual addresses are not stated. While the affidavits contain notarized signatures, it is not possible to ascertain who the petitioners are. It does not appear that unredacted identification information was submitted to the Supreme Court, nor does it appear that the redaction of such information was authorized by the Supreme Court. None of the affidavits explain why anonymity was appropriate.

Footnote 2: These beliefs appear to derive from Jewish religious precepts.